Andrew Rozynski, Esq. (NY# 5054465; *pro hac vice*, to be filed)
EISENBERG & BAUM, LLP
24 Union Square East, Fourth Floor
New York, NY 10003
212-353-8700 (tel.)
212-353-1708 (fax)
arozynski@eandblaw.com
*Attorneys for Plaintiff*


**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
-------------------------------------------------------------

SCOTT ALLEN TOMEI,
          Plaintiff,

     v.

PARKWEST MEDICAL CENTER and
COVENANT HEALTH,

       Defendant.

**Civ. No. 3:19-CV-41**

**COMPLAINT**

**JURY TRIAL DEMANDED**

-------------------------------------------------------------

     Plaintiff, SCOTT TOMEI, by and through his undersigned counsel, EISENBERG &

BAUM, LLP, hereby files this Complaint against Defendants, PARKWEST MEDICAL

CENTER and COVENANT HEALTH, and alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

     1.    Plaintiff SCOTT TOMEI is profoundly deaf and communicates primarily in

American Sign Language ("ASL"), which is his expressed, preferred, and most effective means

of communication. His deafness impacted his ability to learn and acquire language from an early

1

age, and as a result, he has difficulty communicating in English.[1] Plaintiff is likewise unable to effectively communicate by reading lips.[2] Defendants are a hospital and healthcare network located and based in Knoxville Tennessee.

2.      Defendants both hindered and prevented Plaintiff from benefitting from their services, and discriminated against Plaintiff unlawfully, on the basis of Plaintiff's disability of deafness by refusing to provide the ASL interpreters that Plaintiff required to understand and participate in his medical care during a surgery and subsequent hospitalization in Defendants' facilities that he was made to endure after injuring his leg and foot in 2017. This denial was in spite of Plaintiff's repeated requests for an interpreter.

3.      Based on Plaintiff's allegations herein, it is evident that Defendants have failed to implement policies, procedures, and practices respecting the civil rights and communication needs of deaf individuals. Plaintiff brings this lawsuit to compel Defendants to cease unlawful discriminatory practices and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity for deaf individuals to participate in and benefit from Defendants' health care services.

4.      Plaintiff brings this action seeking declaratory, injunctive, and equitable relief;

---

[1] Due to physical, environmental, and pedagogical factors, many deaf individuals have difficulty acquiring spoken languages such as English. Indeed, the median reading level of deaf high school graduates is fourth grade. This is because many deaf people acquire English as their second language (after ASL or another form of sign language) well past the critical developmental period of language acquisition.

[2] Lip-reading, or the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication and is no substitute for direct communication through a qualified sign language interpreter. Only a small number of spoken sounds in aural language are visible, and many of those words appear identical on the lips. Even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, he or she would still not necessarily understand the English language as English and ASL are distinct languages with disparate grammatical structures.

2

compensatory damages; and attorneys' fees and costs to redress Defendants' unlawful discrimination against Plaintiff on the basis of his disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq.; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; and other state and common law causes of action.

## THE PARTIES

5.      Plaintiff SCOTT TOMEI brings this action as an individual residing in Knoxville, Tennessee. Plaintiff is a profoundly deaf individual who has limited English proficiency and who primarily communicates in American Sign Language. Plaintiff is substantially limited in the major life activities of hearing and speaking and is an individual with a disability within the meaning of federal and state civil rights laws.

6.      Defendant PARKWEST MEDICAL CENTER is a corporation with a corporate address at 9352 Park West Boulevard, Knoxville, Tennessee 37923.

7.      Defendant COVENANT HEALTH is a corporation with a corporate address at 100 Fort Sanders West Boulevard, Knoxville, Tennessee 37922. Upon information and belief, Defendant PARKWEST MEDICAL CENTER is a part of the COVENANT HEALTH network. Upon information and belief, Defendants are the recipients of federal financial assistance, including Medicare and/or Medicaid reimbursements.

## JURISDICTION & VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under the laws of the United States, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state and local laws.

3

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants are residents of this district, and/or because Defendants have sufficient contacts with this District to subject it to personal jurisdiction and had those contacts at the time this action is commenced, and/or the acts and omissions giving rise to this Complaint occurred within this District.

## STATEMENT OF FACTS

10.     Plaintiff is a profoundly deaf individual who communicates primarily in American Sign Language (ASL).

11.     Plaintiff has limited proficiency in English, cannot effectively communicate by reading lips, and requires auxiliary aids and services to communicate effectively in a medical setting.

12.     On or around October 21, 2017, Scott Tomei fell and sustained injuries in his right leg and foot from which he began to experience numbness and pain.

13.     On October 24, 2017, Mr. Tomei went to Defendants' facility Parkwest Hospital to receive treatment for his injuries.

14.     Upon his arrival at the hospital, Plaintiff requested a live ASL interpreter. Hospital staff refused Plaintiff's request.

15.     Although he was unable to communicate with staff without the aid of an interpreter, Plaintiff was shown an x-ray of his knee and he was sent home with an antibiotic and ibuprofen.

16.     On October 26, 2017, Plaintiff sought medical care at the Lenoir City Emergency Room after the pain in his leg and foot increased.

17.     At Lenoir, Plaintiff received a physical exam, an ultrasound, a Catscan, and an x-

4

ray. Doctors determined that Plaintiff had blood clots in his right leg.

18.     Lenoir medical personnel transferred Plaintiff back to Defendants' hospital by ambulance to see a vascular surgeon.

19.     Prior to Plaintiff's transfer, a Lenoir City Emergency nurse called Defendants' facilities to request an interpreter for Plaintiff. Defendants' staff responded that they had an interpreter and would provide interpretive services to Plaintiff.

20.     However, no interpreter was provided to Plaintiff upon his arrival in Defendants' emergency department.

21.     Once admitted, Defendants' staff refused to provide Plaintiff with anything other than a Video Remote Interpreting (VRI) device.

22.     However, Defendants' VRI machine experienced technical difficulties and did not provide effective communication. More specifically, the VRI was nonfunctional because the hospital's network firewalls kept interrupting the video feed, disconnecting the device, the screen also kept freezing, and the picture was blurry. [3]

23.     On October 27, 2017, Plaintiff underwent surgery by Dr. Christopher Pollock who attempted to remove Plaintiff's blood clots and who inserted a medical device in Plaintiff's leg to

---

[3] Video Remote Interpreting (VRI) is a video telecommunication service that uses devices such as web cameras or videophones to provide sign language or spoken language interpreting services through a remote or offsite interpreter. VRI is inappropriate in many circumstances, including when the patient has other conditions that impair the patient's ability to utilize the device i.e., if the patient has a visual impairment, is in a lot of pain, or cannot achieve the proper posture; when there are many people in a room; when staff is inadequately trained to set up or operate the device; or in situations that are especially complicated or emergent.

remove residual blood clot remnants.

24.     The surgery and the use of the medical device left Plaintiff in severe pain.

25.     Apart from the ineffective VRI machine, no interpreter services were provided to Plaintiff before, during, or after his surgery, despite repeated unheeded requests.

26.     Instead, during Plaintiff's surgery, his daughter was made to serve as an interpreter to enable communication between Plaintiff and medical staff.

27.     On October 28, 2017, the medical device used to remove remnants of Plaintiff's blood clots was removed from his leg. However, Plaintiff continued to feel intense burning and pins-and-needles pains.

28.     At this time, Plaintiff was heavily sedated and very uncomfortable. He was also unable to communicate with medical staff about his condition and the pain he was experiencing. As a result, Plaintiff was extremely distressed.

29.     On October 29, 2017, the pain in Plaintiff's leg became worse. Plaintiff was screaming in excruciating  pain.

30.     Nonetheless, Defendants refused to provide an ASL interpreter to Plaintiff.

31.     On October 30, 2017, Dr. Pollock visited Plaintiff and asked Plaintiff if he would like to go home. Plaintiff tried his best to inform Dr. Pollock that he was in immense pain, through gestures. Plaintiff and Dr. Pollock attempted to discuss his condition and the degree of his pain. However, without the aid of an interpreter, effective communication was not possible. As a result, Dr. Pollock sent Plaintiff home.

32.     No interpreter was provided for Plaintiff at discharge and he was sent home heavily sedated and with a blue foot.

33.     At home, the pain in Plaintiff's foot and leg intensified. He was unable to sleep.

34.     On October 31, 2017, a physical therapist and a nurse from Covenant Health came to visit Plaintiff and saw how bad his foot was. The therapist could not continue physical therapy because the state of his foot was too poor. The nurse and the physical therapist called Dr. Pollock.

35.     Dr. Pollock told Plaintiff to call his family doctor and make a follow up appointment for November 1, 2017.

36.     November 1, 2017, Plaintiff had an appointment with Dr. Howard Holmes who was concerned that Plaintiff had developed compartment syndrome due to the swelling in his foot.

37.     Dr. Holmes sent Plaintiff to University of Tennessee Medical Center, where he was immediately provided with 24/7 live ASL interpretive services.

38.     On November 2, 2017, Plaintiff underwent another surgery to remove his blood clots at University of Tennessee Medical Center. A medical device was again inserted into Plaintiff's foot to help remove blood clots. University of Tennessee Medical Center provided interpreter services to Plaintiff before, during, and after the procedure.

39.     November 5, 2017, Plaintiff was informed (through the use of an interpreter) that his leg had not improved and that he would have to undergo a partial amputation.

40.     University of Tennessee Medical Center staff informed Plaintiff (through the use of an interpreter) that they would have been able to save his foot if he had come to their facilities earlier.

41.     November 7, 2017, 30% of Plaintiff's right leg was amputated from the knee down. Plaintiff was extremely upset about the loss of his leg.

42.     Prior to his transfer to University of Tennessee Medical Center, Plaintiff was

deprived of interpretive services. In fact, apart from its entirely non-functional VRI, Defendants provided no auxiliary aids or services to Plaintiff whatsoever.

43. However, in most instances, effective communication could not have taken place between Plaintiff and Defendants' staff without the aid of a qualified ASL interpreter.

44. Indeed, as a result of Defendants' failure to provide effective auxiliary aids and services, Plaintiff did not understand the reasons for his admission; the purposes of the treatments being provided; the common risks and/or benefits of those treatments; the common risks, side effects, and benefits of medications given; the specific dosage instructions for medications given; the existence of any alternative treatments; the approximate length of care; the potential side effects of stopping treatment; the details of any aftercare or discharge instructions; etc.

45. Because Plaintiff's lacked information and understanding about his medical state, he did not seek medical attention from University of Tennessee Medical Center sooner. As a result, Plaintiff lost his leg unnecessarily.

46. Additionally, Defendants' discrimination against Plaintiff, and Plaintiff's resulting lack of understanding of his medical care, caused Plaintiff to suffer humiliation, anger, frustration, stress, anxiety, and emotional distress.

47. The loss of Plaintiff's foot also caused him to experience severe emotional distress.

48. Defendants and Defendants' staff knew that Plaintiff is deaf and were aware that Plaintiff made repeated requests for interpreters.

49. Defendants also knew or should have known of their obligation as a health care provider under the ADA, the RA, and their equivalents to develop policies to promote

compliance with these statutes and to provide reasonable accommodations, including but not limited to the provision of ASL interpreters to ensure effective communication with deaf persons.

50. Defendants and their staff knew or should have known that their actions and/or inactions created an unreasonable risk of causing Plaintiff greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

51. Nonetheless, Defendants prevented Plaintiff from benefitting from its services by failing to provide the ASL interpreters necessary for his participation and care.

52. In doing so, Defendants intentionally discriminated against Plaintiff and acted with deliberate indifference to his federally protected rights.

53. Defendants' wrongful and intentional discrimination against Plaintiff on the basis of his disability is reflected by Defendants' failure to train employees and promulgate policies of non-discrimination against deaf individuals.

54. As a result of Defendants' failure to ensure effective communication with Plaintiff, Plaintiff received services that were objectively substandard and that were inferior to those provided to patients who are hearing.

55. Plaintiff is entitled to equal access to services offered by Defendants as are enjoyed by non-disabled persons.

56. Plaintiff still wishes to access Defendants' services and receive care in Defendants' facilities as it is the closest hospital to his home, but is being prevented from doing so by Defendants' discrimination against his on the basis of his disability.

## CLAIM I: VIOLATIONS OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

57.     Plaintiff repeats and re-alleges all preceding paragraphs in support of this claim.

58.     At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act has been in full force and effect and has applied to the Defendants' conduct.

59.     At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking  and has been an individual with a disability within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

60.     At all times relevant to this action, Plaintiff's primary language for communication has been American Sign Language (and not English), and Plaintiff has had limited ability to read, write, speak, or understand English. Plaintiff has therefore been an individual with limited English proficiency within the meaning of Section 1557 of the Patient Protection and Affordable Care Act, 45 C.F.R. § 92.4.

61.     At all times relevant to this action, Defendants received federal financial assistance, including Medicare and/or Medicaid reimbursements, and have been principally engaged in the business of providing health care. Therefore, Defendants are a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

62.     Pursuant to Section 1557 of the Patient Protection and Affordable Care Act, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

63.     Federal regulations implementing Section 1557 of the Patient Protection and

10

Affordable Care Act provide that "[a] covered entity shall take reasonable steps to provide meaningful access to each individual with limited English proficiency eligible to be served or likely to be encountered in its health programs and activities." 45 C.F.R. § 92.201.

64.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "(1) A covered entity shall offer a qualified interpreter to an individual with limited English proficiency when oral interpretation is a reasonable step to provide meaningful access for that individual with limited English proficiency; and (2) A covered entity shall use a qualified translator when translating written content in paper or electronic form." 45 C.F.R. § 92.201(d).

65.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "[a]  covered entity that provides a qualified interpreter for an individual with limited English proficiency through video remote interpreting services in the covered entity's health programs and activities shall provide: (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter's face and the participating individual's face regardless of the individual's body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the video remote interpreting." 45 C.F.R. § 92.201(f).

66.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "[a] covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others

in health programs and activities." 45 C.F.R. § 92.202(a).

67.     Federal regulations implementing Section 1557 of the Patient Protection and Affordable Care Act provide that "(1) A [covered] entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 45 C.F.R. § 92.202(a); 28 C.F.R. § 35.160(b).

68.     As set forth above, Defendants discriminated against Plaintiff, on the basis of disability, in violation of the Patient Protection and Affordable Care Act and its implementing regulations.

69.     The Patient Protection and Affordable Care Act, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to "any person aggrieved" by discrimination in violation thereof. 42 U.S.C. § 18116(a).

70.     Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Patient Protection and Affordable Care Act.

71.     Plaintiff is therefore entitled to injunctive relief; attorneys' fees, costs, and disbursements; and compensatory damages for the injuries and loss they sustained as a result of Defendants' discriminatory conduct and deliberate indifference as hereinbefore alleged, pursuant to 42 U.S.C. § 18116(a).

# PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief:

a.      Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act.

b.      Issue an injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals, or their companions, meaningful access to and full and equal enjoyment of Defendants' facilities, services, or programs;

c.      Issue an injunction ordering Defendants:

   i.   to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

   ii.  to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly marked and worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

   iii. to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most

13

appropriate method under the circumstances, recognizing that the VRI is not appropriate in all medical situations;

iv. to develop, implement, promulgate, and comply with a policy to ensure, in the event the Defendants utilize a Video Remote Interpreting System ("VRI"), that such system has a high-speed Internet connection; a video screen with appropriate size, position, capture angle, focus, and proximity to the deaf individual; and appropriate audio quality. When possible, the equipment should be portable and made available to the patient where the patient is located, preferably in a private room to minimize distractions and maintain confidentiality;

v. to train all their employees, staffs, and other agents on a regular basis about how to properly use VRI services (including how to set up the VRI system and how to obtain technical assistance in case of system malfunction or failure) and how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals;

vi. to create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

vii. to train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ACA;

d. Award to Plaintiffs:

i. Compensatory damages pursuant to the ACA;

ii. Reasonable costs and attorneys' fees pursuant to the ACA;

iii. Interest on all amounts at the highest rates and from the earliest dates allowed

by law;

iv. Any and all other relief that this Court finds necessary and appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all of the issues a jury properly may decide, and for all of the requested relief that a jury may award.

Dated: January 25, 2019

Respectfully submitted,

By:

Andrew Rozynski, Esq.
(NY# 5054465)
*Pro hac vice*—to be filed
arozynski@eandblaw.com

EISENBERG & BAUM, LLP
24 Union Square East, Fourth Floor
New York, NY 10003
212-353-8700 (tel.)
212-353-1708 (fax)
*Attorneys for Plaintiff*

s/Van R. Irion
Van R. Irion (TN BPR#024519)
Law Office of Van R. Irion, PLLC
800 Gay St., Ste. 700
Knoxville, TN 37929
(865) 766-4040
van@irionlaw.com
Attorney for the Plaintiff

15