# EXHIBIT  G

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF TENNESSEE
 3            CASE NO. 3:19-cv-00041
 4
 5              -  -  -
 6   SCOTT ALLEN TOMEI,            :
 7                    Plaintiff,  :
 8       vs.                      :
 9   PARKWEST MEDICAL CENTER and   :
10   COVENANT HEALTH,              :
11                    Defendants.:
12
13   * * * * * * * * * * * * * * * * * * *
14
15        DEPOSITION OF SHARON MONDAY
16
17
18   ==================================================
19     JEFF RUSK COURT REPORTING & VIDEO
20        Registered Professional Reporters
          Certified Legal Video Specialist
21
22     Catherine I. Golembeski, NJ-CCR, RPR, LCR
           805 Eleanor Street, N.E.
23        Knoxville, Tennessee 37917
             (865) 246-7656
24          Jeff@JeffRusk.com
25
```

ORIGINAL

**Page 3**

```
 1              I N D E X
 2   SHARON MONDAY                       PAGE
 3   EXAMINATION BY MR. ROZYNSKI             5
 4   EXAMINATION BY MR. YOUNG               63
 5
 6
 7   NO.         INDEX OF EXHIBITS        PAGE
 8   Plaintiff's Exhibit 4  Rule 30(b)6 Notice   11
 9   Plaintiff's Exhibit 5  E-mail 12/13/19      11
10   Plaintiff's Exhibit 6  Parkwest Medical Center
                            Answer              15
11
     Plaintiff's Exhibit 7  Covenant Health CBL
12                          Accommodating Deaf/Hard
                            of Hearing Individuals  28
13
     Plaintiff's Exhibit 8  Complaint             52
14
     Plaintiff's Exhibit 9  Stratus Case Report   62
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFF:
 4     ANDREW ROZYNSKI, ESQ.
       EISENBERG AND BAUM, LLP
 5     24 Union Square East, Fourth Floor
       New York, New York 10003
 6     (212) 353-8700
       arozynski@EandBLaw.com
 7
 8
 9
     FOR THE DEFENDANTS:
10
       BRODERICK L. YOUNG, ESQ.
11     DEVON LYON, ESQ.
       ARNETT, DRAPER & HAGOOD, LLP
12     800 S. Gay Street
       2300 First Tennessee Plaza
13     Knoxville, Tennessee 37901
       (865) 546-7000
14     byoung@adhknox.com
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          D E P O S I T I O N
 2     The deposition of SHARON MONDAY, taken at
 3   the request of the Plaintiff, for purposes of
 4   discovery, pursuant to the Tennessee Rules of Civil
 5   Procedure on the 17th Day of December, 2019, at the
 6   offices of Arnett, Draper & Hagood, LLP, 800 S. Gay
 7   Street, 2300 First Tennessee Plaza, Knoxville,
 8   Tennessee 37901 before Catherine Golembeski,
 9   Registered Professional Reporter and Notary Public
10   at Large for the State of Tennessee.
11      It is agreed that the deposition may be
12   taken in machine shorthand by Catherine Golembeski,
13   Licensed Court Reporter and Registered Professional
14   Reporter and Notary Public, and that she may swear
15   the witness and thereafter transcribe her notes to
16   typewriting and present to the witness for
17   signature, and that all formalities touching
18   caption, certificate, filing, transmission, etc.,
19   are expressly waived.
20      It is further agreed that all objections
21   except as to the form of the questions are reserved
22   to on or before the hearing.
23
24
25
```

Page 5

1          EXAMINATION
2      (Proceedings began at 2:48 p.m.)
3          SHARON MONDAY,
4  called as a witness at the instance of the
5  Plaintiff, having been first duly sworn, was
6  examined and deposed as follows:
7  EXAMINATION BY MR. ROZYNSKI:
8      Q.  Good afternoon.
9      A.  Hi.
10     Q.  My name is Andrew Rozynski.  I'm with
11  the law firm of Eisenberg and Baum.  And I
12  represent Scott Tomei in the matter against
13  Parkwest Medical Center.  You are here to take your
14  deposition.
15         Have you ever had your deposition taken
16  before?
17     A.  Pardon?
18     Q.  Have you ever had your deposition taken
19  before?
20     A.  It's been several years ago.  Many
21  years ago.
22     Q.  Was that in connection with a case with
23  Parkwest?
24     A.  No.
25     Q.  Okay.  Since it's been many years ago,

Page 6

1  let me go over some of the ground rules of a
2  deposition so we can go as smoothly as possible.
3         First and foremost, you have sworn to
4  tell the truth, which means it's an oath to tell
5  the truth.  If you say anything that's false, you
6  could be subject to punishment.  Are you aware of
7  that?
8      A.  Yes.
9      Q.  And the court reporter's taking down
10  everything that we're saying and is going to be
11  making a transcript of what we talk about here
12  today.  It's really important that we have a clear
13  record.  So how we do that is by insuring that we
14  have a clear question and answer.  How we can do
15  that is sometimes you might know the answer to my
16  question before I finish asking the question.  I
17  just ask that you hold off on the urge and let me
18  finish asking the question, then answer.  And I
19  will also hold off on asking my next question until
20  you finish your answer.  Okay?
21     A.  Okay.
22     Q.  Also, it's not a memory test.  If you
23  don't remember something, that's fine.  I just want
24  your best recollection.  And there are ways we can
25  do that.  For instance, if I ask you when something

Page 7

1  happened and you don't know the exact date but you
2  remember it happening in October of 2017, you can
3  say, I believe that happened in October 2017 rather
4  than saying I don't know when that happened.  Okay?
5      A.  Okay.
6      Q.  All right.  Also, there's certain
7  things that court reporters don't like, like when a
8  witness says um-hum, or uh-huh, or shake their
9  head, nod their head, point to things in the room.
10  I ask that you give a verbal response to whatever
11  the answer is.  Okay?
12     A.  Yes.
13     Q.  All right.  Also, I don't expect this
14  to be particularly long.  But, you know, if you
15  need to take a break at any time, just let me know
16  and just not in the middle of a question.  Okay?
17     A.  Okay.
18     Q.  All right.  Could you please state your
19  name and address for the record?
20     A.  Sharon Monday.  You need my home
21  address?
22     Q.  Yes, please.
23     A.  722 Chapel Wood Circle, Maryville,
24  Tennessee 37804.
25     Q.  Okay.  Have you been known by any other

Page 8

1  names?
2      A.  Well, other than before I was married,
3  no.
4      Q.  Okay.  All right.  And who is your
5  current employer?
6      A.  Parkwest Medical Center.
7      Q.  And for how long have you worked for
8  them?
9      A.  I have worked for Covenant Health for
10  42 years.
11     Q.  Okay.  And what is your current
12  position?
13     A.  Regulatory compliance manager.
14     MR. ROZYNSKI:  Okay.  Is this witness
15  being produced for any 30(b)6 topics?
16     MR. YOUNG:  You saw that e-mail I sent
17  you, right?  Let's go off the record.
18     (Off-the-record conference.)
19     Q.  Okay.  So you said you're a regulatory
20  and compliance?
21     A.  Yes.
22     Q.  What's your official title?
23     A.  Manager of regulatory compliance.
24     Q.  For all Covenant Health?
25     A.  For Parkwest Medical Center.

Page 9

1     Q.  Are you a lawyer?

2     A.  No, I'm an RN.

3     Q.  For how long have you been an RN for?

4     A.  41 years.

5     Q.  And prior to being the manager of

6 regulatory and compliance at Parkwest, what job did

7 you hold? Job title did you hold?

8     A.  Let me think. I guess my last title

9 before that was, I was a director of patient care.

10 Previous to that I was a manager of nursing unit.

11 Prior to that I was a house supervisor. Prior to

12 that I was a staff nurse.

13     Q.  Okay. So how long have you been in

14 your current position?

15     A.  I think close to 20 years.

16     Q.  Okay. What are your general job

17 duties?

18     A.  Looking to make sure that we are being

19 compliant with regulatory standards, joint

20 commission, CMS, those type of things and helping

21 us prepare for the survey.

22     Q.  Were you involved with getting the

23 hospital up to compliance when the Affordable Care

24 Act was passed?

25     A.  In relation to any policies that may

Page 10

1 have been related to that, we worked as a system on

2 some of those with legal counsel.

3     Q.  Okay. Is one of the things that you

4 worked on accommodating patients and companions

5 with limited English proficiency?

6     A.  Yes.

7     Q.  Is that something that was new with the

8 Affordable Care Act?

9     A.  No.

10     Q.  How long, as far as you're aware, have

11 there been requirements to accommodate people with

12 limited English proficiency at Parkwest?

13     A.  At Parkwest? I am not sure of the

14 exact date. I do know that prior to the Affordable

15 Care Act, a Covenant Care Act, we had a policy in

16 place that was just for Parkwest. I mean, so it's

17 -- we've had that in place for several years before

18 it became a system policy.

19     Q.  Okay. Are you responsible for training

20 staff members on compliance issues?

21     A.  I personally am not responsible. I

22 work with our education folks in regard to what

23 some of the content and stuff like that, but I'm

24 not personally responsible.

25     Q.  Okay. Who's the person that you worked

Page 11

1 with that is responsible for education?

2     A.  Well, that can depend on if it's at the

3 facility level or if it's at the system level.

4     Q.  Who's responsible for education as it

5 relates to accommodating individuals who don't

6 speak English?

7     A.  We developed a CBL that was a system

8 effort that included regulatory, legal counsel,

9 risk management developed. We put that together.

10     Q.  And do you know who at Parkwest was

11 responsible for insuring that that's disseminated

12 and that staff is educated on those policies and

13 procedures?

14     A.  As specific CBL was assigned at the

15 corporate level and then we verify that it gets

16 assigned ongoing.

17     Q.  And you said it was assigned at the

18 corporate level. Does that mean that there's just

19 online modules that are disseminated to --

20     A.  Yes.

21     Q.  -- staff members at Parkwest?

22     A.  Yes.

23     (Plaintiff's Exhibit 4, Rule 30(b)6

24     Notice, was marked for identification.)

25     (Plaintiff's Exhibit 5, E-mail

Page 12

1 dated 12/13/19, was marked for

2 identification.)

3     Q.  Okay. I'm going to show you a document

4 which has been marked as Plaintiff's Exhibit 4. It

5 is something we call a Rule 30(b)6 notice. And I'm

6 going to give you a copy here. I want you to turn

7 to the page where it says Exhibit A.

8     (Witness Complies.)

9     Q.  You've been produced today to testify

10 as a corporate representative on behalf of Parkwest

11 and Covenant Health in terms of different areas of

12 examination. And I'm going to go through those

13 with you. And my understanding is that you are

14 being produced today for areas of examination one,

15 two, three, eight, 10 only with regard to

16 Paragraphs 76 and 77 in the answer and 11. Is that

17 your understanding?

18     A.  I believe that is correct.

19     Q.  So going to area of examination number

20 one, what did you do, other than speak to your

21 attorney, to be sufficiently prepared to talk about

22 today as Defendant's policies, procedures and

23 training of staff regarding insuring effective

24 communication with deaf or hard of hearing patients

25 or companions from January 1st, 2017 to present?

Page 13

1   A. Just review the policy.

2       Q. Has it been the same policy -- has the
3   same policy been in place from January 1, 2017 to
4   present?

5   A. I'm sorry to when?

6       Q. To the present.

7   A. I believe we've made a slight revision
8   to it since then in 2018 maybe, but I have to go
9   back and look because I've just been looking at
10  what was in place.

11      Q. Okay. Do you know, generally, what the
12  slight revision was to?

13  A. If it was -- if there was a revision,
14  it was related to the handout that's attached to
15  the VRI update to it.

16      Q. Okay. How about area -- and you didn't
17  talk to any other staff members or anyone else
18  other than your attorney to prepare for area number
19  one, just looked at that policy?

20  A. That's correct.

21      Q. How about area of examination number
22  two. Defendant's policies, procedures and training
23  of staff regarding providing interpreter services
24  including the provision of VRI for deaf or hard of
25  hearing patients or companions from January 1st

Page 14

1   2017 to the present. What did you do to prepare
2   for that today?

3   A. I reviewed the CBL.

4       Q. Could you just state for the record
5   what CBL means?

6   A. CBL, continuous -- oh, I can't even
7   remember. Computerized based learning.

8       Q. Is that the only thing that you
9   reviewed was the computerized based learning?

10  A. Yes.

11      Q. Does Parkwest have any in-person
12  training, separate and apart from the computer
13  based learning, that talks about accommodating deaf
14  persons and their companions?

15  A. No.

16      Q. Okay. Moving on to areas of
17  examination number three, how Defendant trained its
18  employees, agents, representatives and/or hospital
19  staff on how to contact an ASL interpreting agency
20  from January 1st, 2017 to present. What did you do
21  to be sufficiently prepared for that today?

22  A. Like I said, I just reviewed the
23  computer based learning module that we had.

24      Q. Okay. Nothing else, correct?

25  A. Pardon?

Page 15

1       Q. Nothing else?

2   A. That's basically it, yes.

3       Q. How about area of examination number
4   eight, Defendant's policies and procedures
5   regarding using non-certified interpreters; i.e.,
6   friends, family, staff. What did you do to be
7   sufficiently prepared for that?

8   A. I just reviewed our policy.

9       Q. And how about area of examination
10  number 10, what did you do to be prepared for that
11  today, other than talk to your attorney?

12  A. I'm not sure I understand. I just
13  talked to the attorney.

14      Q. Just for completeness, I'm going to
15  mark this as Exhibit 6 as the answer from Parkwest
16  Medical Center.

17          (Plaintiff's Exhibit 6, Parkwest
18          Medical Center Answer, was marked for
19          identification.)

20      Q. Just so the record is clear, for areas
21  of examination number 10, I'm going to show you
22  what has been marked as Plaintiff's 6, is the
23  answer of Parkwest Medical Center. And I'll show
24  you Paragraphs 76 and 77. And I just want you to
25  take a look at that and make sure that you're

Page 16

1   sufficiently prepared to testify to that today.

2   A. Yes.

3       Q. So other than talking to counsel, you
4   haven't done anything to prepare for that area of
5   examination, correct?

6   A. Yes.

7       Q. Okay. And then you've also been
8   prepared to testify as to area of examination
9   number 11, correct?

10  A. Yes.

11      Q. And what did you do to prepare for that
12  today?

13  A. We had a complaint system pulled to see
14  if we had any complaints in relation to that.

15      Q. Okay. Are you familiar, generally, if
16  staff are supposed to insure that interpreters are
17  provided for all persons who don't speak English as
18  a primary language?

19  A. Can you repeat that again?

20      Q. Are you aware if Parkwest requires its
21  staff to insure that they provide interpreters to
22  patients or companions that don't speak English as
23  a primary language?

24  A. Our policy requires -- well, I'll not
25  say requires, indicates that we provide effective

Page 17

1 communication, however that is done.

2     **Q. Are you familiar -- have you reviewed**

3 **the Affordable Care Act 2016 regulations?**

4     A. Not recently.

5     **Q. At some point have you?**

6     A. Parts of it.

7     **Q. Okay. Are you aware that the 2016**

8 **Affordable Care Act regulations require medical**

9 **providers such as Parkwest to insure that all**

10 **patients and companions can communicate in their**

11 **primary language?**

12     A. Yes.

13     **Q. Okay. And what does Parkwest do to**

14 **insure that all patients or companions can**

15 **communicate in their primary language?**

16     A. We have our policies in place to guide

17 our staff. We have forms in place when certain

18 patients come in and request services.

19     **Q. Okay. Anything else?**

20     A. Such as?

21     **Q. Anything else that Parkwest does to**

22 **insure that patients and companions get**

23 **communication access in their primary language?**

24     A. I mean, we do have options on how that

25 is provided.

Page 18

1     **Q. What do you mean?**

2     A. In regard to, we had the video remote

3 interpreting. We can provide on-site interpreters.

4 We have via telephone.

5     **Q. Okay. How does Parkwest insure that**

6 **deaf and hard of hearing patients or companions are**

7 **able to communicate in their primary language of**

8 **American sign language throughout their care at**

9 **Parkwest?**

10     A. On admission or registration, they are

11 asked for their preference. We have a form for

12 them to use so that they can let us know what their

13 preferences are.

14     **Q. Are you aware that there's a**

15 **communication assessment form that Parkwest has?**

16     A. Yes, that's the form I'm talking about.

17     **Q. And who's responsible to fill that out?**

18 **Is that registration, or triage or something else?**

19     A. Either one.

20     **Q. Either registration or triage?**

21     A. Uh-huh.

22     **Q. Is that a yes?**

23     A. Yes, sorry.

24     **Q. And does Parkwest mandate that one or**

25 **the other do it, or are they both responsible for**

Page 19

1 doing it?

2     A. I don't think that we mandate a

3 specific person to do that.

4     **Q. Okay. So how does Parkwest insure**

5 **compliance that that form is being filled out?**

6     A. I haven't done -- actually, we've not

7 actually done a study in regard to that, but even

8 if the form was not filled out, we're still

9 responsible for insuring effective communication.

10     **Q. Are you aware that under the Affordable**

11 **Care Act that there's a requirement of entities to**

12 **affirmatively do an assessment of the deaf person's**

13 **communication abilities upon admission?**

14     A. I was not aware of that.

15     **Q. Are you aware of anything that Parkwest**

16 **does to mandate or insure throughout any point of**

17 **the process that assessment is done of the deaf**

18 **person?**

19     A. Other than at registration?

20     **Q. So you do mandate at registration they**

21 **do the assessment?**

22     A. Per our policy that is normally when

23 it's done during registration or coming through the

24 admission process.

25     **Q. So in your policy it states that the**

Page 20

1 **assessment, the language assessment form should be**

2 **filled out during registration?**

3     A. Let me verify.

4     **Q. Okay.**

5     A. It does state that in the communication

6 assessment tool for deaf and hard of hearing

7 individuals maybe used to identify the patient

8 companion designated representatives requesting

9 communication aides, if any.

10     **Q. I want you to -- so I think what you're**

11 **looking at is Exhibit 2, Plaintiff's Exhibit 2,**

12 **which is the Covenant Health Rights and**

13 **Responsibilities; subject, deaf and hard of hearing**

14 **I want you to look at.**

15     A. Yes.

16     **Q. Can you tell me what page of that**

17 **exhibit you are referring to when you're speaking?**

18     A. It's on page two.

19     **Q. Okay.**

20     A. Under procedure.

21     **Q. Okay. So in your procedures it states:**

22 **"When a deaf or hard of hearing patient or**

23 **companion or designated representative presence to**

24 **the facility or office, a communication assessment**

25 **tool for deaf and hard of hearing individuals form**

Page 21

1  CH80850050 may be used to identify the patient,
2  companion/designated representatives requested
3  communication aides, if any." So this is not a
4  required procedure, but rather discretionary at
5  registration?
6       MR. YOUNG: I'll object to the extent
7  for the procedure. If you could clarify what you
8  mean by that term.
9       MR. ROZYNSKI: There's a title saying
10 procedure under the policy, that's what I'm
11 referring to.
12      MR. YOUNG: But there's, like, many,
13 many letters to that. I don't want to -- are you
14 talking about the assessment of the need or talking
15 about the form? Which one are you talking about?
16      MR. ROZYNSKI: I think my question was
17 clear. I understand my question. If you have an
18 objection to form, the objection's noted.
19      But let's repeat the last question.
20      (The Court Reporter reads back the
21 requested text.)
22      MR. YOUNG: Okay. Same objection.
23      Q.  Okay. So is it discretionary or
24 required?
25      MR. YOUNG: Again, are you talking

Page 22

1  about the form?
2       MR. ROZYNSKI: Yes.
3       MR. YOUNG: Okay.
4       A.  Based on policy, it may be used so the
5  form is not -- from my interpretation, I don't have
6  a problem with it.
7       Q.  Okay.
8       A.  It may be used. So it's not actually
9  required to be used.
10      Q.  Okay. Do you know why it's not
11 required?
12      A.  No, I do not.
13      Q.  Do you believe that it's a good
14 practice to use this form?
15      A.  That would be my personal opinion.
16      Q.  Yes.
17      MR. YOUNG: I'll object to the form of
18 the question. You asked about what the company
19 policy is.
20      Q.  I'm asking about your opinion.
21      MR. YOUNG: That's an improper
22 question. It's about the company's position on
23 these things.
24      MR. ROZYNSKI: Are you instructing the
25 witness not to answer?

Page 23

1       MR. YOUNG: I think it's an improper
2  question. I don't think she's required to offer an
3  opinion on anything.
4       MR. ROZYNSKI: So on what privilege are
5  you instructing the witness not to answer?
6       MR. YOUNG: We have a Tennessee case, a
7  witness can not be required to offer an opinion.
8       MR. ROZYNSKI: Under what Federal rule?
9       MR. YOUNG: We have a Tennessee case on
10 it. Do you have a Federal rule saying a witness
11 can't be required to offer an expert opinion?
12      MR. ROZYNSKI: I have Federal Rules of
13 Civil Procedure that says the only way you can stop
14 a witness from answering a question is based on
15 privilege. And there's no privilege here, so.
16      MR. YOUNG: Let me think about this for
17 a second. Could you just hold on?
18      (A recess transpired.)
19      MR. YOUNG: All right. I don't think
20 it's relevant. I can say that she's not going to
21 be speaking as a 30(b)(6) witness when she responds
22 to that question.
23      MR. ROZYNSKI: Sure.
24      MR. YOUNG: But if you can answer the
25 question as asked. Over my objection.

Page 24

1       It's irrelevant. I think it's improper
2  to ask her opinion on an issue like this. She's
3  certainly not testifying as a 30(b)(6) witness as
4  to the scope of this question.
5       MR. ROZYNSKI: Could you repeat my last
6  question.
7       (The Court Reporter reads back the
8  requested text.)
9       Q.  So you do believe that it would be best
10 practices to use this form?
11      MR. YOUNG: Same objections.
12      Go ahead.
13      A.  My person opinion?
14      Q.  Yes.
15      MR. YOUNG: Go ahead.
16      A.  Is that it would be best practice, but
17 that does not mean that it's the only practice.
18      Q.  What are the other ways in which
19 communication assessments can be done other than
20 through this form at Parkwest?
21      A.  Instead of the form?
22      Q.  Yes.
23      A.  Just patient preference and discussion
24 with the patient, verbalization or communication
25 with the patient what their request is.

Page 25

1     Q.  And how would one do that?  How would
2  one communicate with somebody who doesn't speak
3  English to assess their communication needs?
4     A.  Well, if they can't communicate, then
5  they're going to contact the house supervisor and
6  get an interpreter.
7     Q.  And they need to contact the house
8  supervisor to get a VRI?
9     A.  Normally they do contact the house
10  supervisor to get the VRI.
11     Q.  Why is that?
12     A.  That's where it's normally kept and the
13  house supervisor knows where it's at.  Unless it's
14  in certain designated areas where there is a VRI
15  housed.
16     Q.  So whether it be VRI or an in-person
17  interpreter, a house supervisor should be contacted
18  to obtain that service?
19     A.  Yes.
20     Q.  Do you know whether Parkwest instructs
21  its staff whether it's advisable to use family
22  members or not as interpreters?
23     A.  Per our policy, I need to refer to --
24     Q.  Sure.
25     A.  -- the policy.

Page 26

1     Q.  And just for the record, the witness is
2  referring to Exhibit 2?
3     A.  P-2.
4     Q.  Yes.
5     A.  On page four, J, we discuss
6  nonprofessional interpreters.  And, basically, even
7  though it is not our preference, that if it's the
8  patient's request, we will honor that request to
9  use a family member or a nonprofessional
10  interpreter.
11     Q.  Are you familiar with the regulations
12  of the Affordable Care Act in which it states that
13  you are to use medically certified interpreters?
14     A.  I was not fully aware of that, no.
15     Q.  Okay.  Are you aware of any technical
16  guidance or assistance on the Affordable Care Act
17  which states that even if a patient wants a family
18  member to interpret, that the medical -- that the
19  entity should have their own qualified medically
20  certified interpreter there to check that the
21  interpretation that's being conducted by the family
22  members is accurate?
23     A.  Was I aware of that?
24     Q.  Yes.
25     A.  I'm not sure that I was a hundred

Page 27

1  percent aware that it was required.
2     Q.  Okay.  Have you heard that before?
3     A.  I had heard that that was the
4  recommendation.
5     Q.  Okay.  And why do you think that's a
6  recommendation?
7     A.  Personal opinion again.
8     Q.  Sure.
9     MR. YOUNG:  Outside the 30(b)(6.
10     Go ahead.
11     A.  Is that since we have to have somebody
12  to interpret or else we can't effectively
13  communication with them, then we do not know what
14  they're interpreting, or what they're saying.
15  There's no way to verify what they're telling the
16  patient.
17     Q.  Does the Parkwest policies, or
18  procedures or training inform staff of some of the
19  risks of using family members as interpreters?
20     A.  I believe, referring back to the
21  policy, which is on page four, where we talk about
22  nonprofessional interpreters, it does talk about
23  based on complexity and nature of the
24  communication, while we prefer a qualified
25  interpreter.

Page 28

1     Q.  My question is a bit different.  Does
2  Parkwest inform staff through its training policies
3  or procedures of any of the potential risks of
4  using family members as interpreters?
5     A.  If I could refer back to the CBL
6  because I'm not sure, before I can answer that.
7     MR. YOUNG:  CBL an exhibit.
8     MR. ROZYNSKI:  I don't think it is yet,
9  but we can do an exhibit.
10     (Plaintiff's Exhibit 7, Covenant Health
11     CBL Accommodating Deaf/Hard of Hearing
12     Individuals, was marked for
13     identification.)
14     Q.  Okay.  I'm handing you P-7, which is
15  the CBL from Covenant Health Accommodating Deaf/
16  Hard of Hearing Individuals.  Here you go.
17     A.  Okay.  Based on review of the CBL, I do
18  not see that list or part of the education.
19     Q.  Okay.  Do you know why Parkwest does
20  not have that in their materials, whether it be
21  training policies or procedures informing staff of
22  potential risks of using family members as
23  interpreters?
24     A.  No, I do not.  I mean, just includes
25  the information about using patient or family

Page 29

1  members, but...
2      Q.  Is it too financially costly to provide
3  a sign language interpreter to deaf patients at
4  Parkwest?
5      A.  No.
6      Q.  Okay.  If a patient needed interpreting
7  services 24 hours a day, is that something that
8  Parkwest could provide?
9      A.  Explain 24 hours a day.  I just want to
10  make sure I understand the question.  We provide
11  services 24/7 so we do provide interpreting
12  services 24/7.
13      Q.  Okay.  So if interpreting services are
14  requested 24/7, they will be provided 24/7?
15      A.  Could you give me an example?  I just
16  want to make sure I understand.
17      Q.  If a patient requests interpreting
18  services 24 hours a day.
19      A.  24 hours a day?
20      Q.  Yes.  Is that something that Parkwest
21  could provide?
22      A.  I believe -- I'm not sure that would be
23  considered a reasonable accommodation, depending on
24  the situation, because we have -- we do have the
25  VRI and stuff in between whenever, so we have not

Page 30

1  been provided 24/7 round the clock continuously for
2  a patient.  Is that what you're asking?
3      Q.  No.  My question is:  Is that something
4  that Parkwest could provide if it was requested?
5      A.  If it was requested?
6      Q.  Yes.
7      A.  It would be discussed.  And whether it
8  was feasible and met reasonable accommodation, I
9  believe.
10      Q.  Okay.  So if something is requested,
11  there's a discussion with somebody regarding
12  whether it's a reasonable request or not?
13      A.  The 24/7 interpreters is what would be
14  the discussion not whether they needed an
15  interpreter or not.
16      Q.  Okay.  If a patient said that they
17  wanted an interpreter for every single
18  communication they had with the doctors or nurses
19  or staff at Parkwest, is that something that could
20  be provided?
21      A.  Potentially, yes, it could be provided.
22      Q.  When you say "potentially", what do you
23  mean?
24      A.  That it could be provided.  I'm not --
25  based on the circumstances and availability of the

Page 31

1  interpreter and all, I'm not sure.
2      Q.  Video remote interpreters provided at
3  all times, right?
4      A.  Yes.
5      Q.  And that could be provided within
6  minutes?
7      A.  Yes.
8      Q.  So with VRI available as well, are you
9  concerned about coverage of providing interpreting
10  services?
11      A.  No.  Am I concerned about it?
12      Q.  Yes.
13      A.  No.
14      Q.  Okay.  You said depending on
15  availability, what did you mean?
16      A.  I'm talking about for a face-to-face
17  interpreter.  I'm not talking about -- I think
18  maybe that's my misunderstanding.
19      Q.  Okay.  If a deaf patient requested an
20  in-person interpreter, is that something that
21  Parkwest would honor?
22      A.  Yes.
23      Q.  Is there an evaluation about whether
24  it's reasonable or not to have an in-person
25  interpreter?

Page 32

1      A.  No.
2      Q.  Okay.  Why would a Parkwest honor that
3  request of the deaf person to have an in-person
4  interpreter?
5      A.  Why would they honor that?
6      Q.  Yeah.
7      A.  It's normally just based on patient
8  request.
9      Q.  Okay.
10      A.  On occasion it might be where VRI is
11  not feasible to be located in the room.
12      Q.  Okay.  So even if a deaf patient didn't
13  want to use the VRI and they preferred an in-person
14  interpreter, that would be provided?
15      A.  Yes.
16      MR. YOUNG:  Could you repeat that last
17  question, please.
18      (The Court Reporter reads back the
19  requested text.)
20      MR. YOUNG:  The in-person interpreter
21  would be provided?
22      MR. ROZYNSKI:  Yeah.
23      MR. YOUNG:  Okay.  I wasn't sure what
24  you're referring back to.
25      Q.  Does Parkwest have a waiver form, for

Page 33

1  instance, if a patient that says:  I don't want a
2  VRI, or a professional interpreter, I want my
3  family member.  Does Parkwest have a form that they
4  could fill out and say they are declining a
5  professional interpreter either through VRI or in
6  person and they prefer a family member to
7  interpret?
8      A.  The only form that I'm aware of is this
9  communication assessment tool.
10      Q.  Okay.  And on that communication
11  assessment tool, if they don't want a professional
12  interpreter, either through VRI or in-person that
13  would be noted in the assessment tool?
14      A.  Yes.
15      Q.  And if they did prefer a family member,
16  that would be indicated on that form, correct?
17      A.  I do not see that request on this form.
18      Q.  Okay.  Are there -- is there a free
19  text so that that could be written in?
20      A.  Pardon?
21      Q.  Is there a free text that that could be
22  written in under other?
23      A.  No.
24      Q.  So there's no way to formally document
25  whether someone prefers a family member to

Page 34

1  interpret?
2      A.  Not that I can tell.
3      Q.  Okay.  Also on page five of the CBL
4  which is Exhibit 7, use of family and friends to
5  facilitate communications it says:  "An adult
6  family member or friend should not be used as an
7  interpreter or to facilitate communication with an
8  individual who is defend or hard of hearing unless
9  one specifically requested by the individual, the
10  family member or friend agrees to provide such
11  assistance and reliance on that family member or
12  friend is appropriate under the circumstances."
13  What does it mean "appropriate under the
14  circumstances"?
15      A.  That I'm not exactly sure.  I think
16  it's based on whether that family or friend is able
17  to, in agreement, and also able to communicate,
18  understanding of what we're talking to them about.
19      Q.  So appropriate means that the family
20  member can communicate what is being talked about?
21      A.  That would be one option, yes.
22      Q.  Anything else?
23      A.  Not that I'm aware of right now.
24      Q.  Should interpretation be utilized only
25  for important communications or all communications

Page 35

1  with staff at Parkwest for someone who does not
2  speak English?
3      A.  I'm sorry, should it be used only with?
4      Q.  Only for "important communications or
5  all communications with staff"?
6      A.  Well, definitely for important
7  communications.  Are you talking about
8  interpretative services?
9      Q.  Yes.
10      A.  Depending on the circumstances, it
11  could be all communication, but specifically for
12  important information.
13      Q.  Do hearing patients only get
14  communication during important medical interactions
15  or for all interactions who speak English?
16      A.  Who speak English?
17      Q.  Yeah.
18      A.  All interactions.
19      Q.  So do you believe that deaf people
20  should get it for all interactions too?
21      A.  I believe they should have effective
22  communication for all interactions.
23      Q.  Okay.  Effective communication means
24  not only that the staff can communicate everything
25  that they want to the patient, but the patient can

Page 36

1  communicate everything they want to the staff,
2  right?
3      A.  Basically, yes.
4      Q.  Okay.  And that both sides shouldn't be
5  limited in any way?
6      A.  Pardon?
7      Q.  And that both sides; the staff and the
8  patient, shouldn't be limited in any way?
9      A.  That is correct.
10      Q.  Okay.  And I believe this is on the
11  seventh page of the computer based learning of
12  Exhibit 7, it's entitled Deaf/Hard of Hearing
13  Signage.  What is this signage that's indicated
14  here?
15      A.  It's a magnet.
16      Q.  Okay.  Where can this magnet be
17  obtained?
18      A.  It should be in all the nurses'
19  stations.  And if not available, the house
20  supervisor should be able to have access to them.
21      Q.  Who's responsible for insuring that the
22  signage is on the white board?
23      A.  I'm not sure if it's -- either nurse or
24  the nurse manager.
25      Q.  Is there any training or materials that

Page 37

1  you're aware of that says the nurse manager or
2  nurse is responsible for insuring that this is
3  posted on the white board?
4      A.  Only what's in the CBL.
5      Q.  And in the CBL does not say who's
6  responsible for that, correct?
7      A.  No, it does not.
8      Q.  Okay.  And why does Parkwest have this
9  signage available to its deaf or hard of hearing
10 patients?
11     A.  Why?
12     Q.  Yes.
13     A.  To alert staff that they are, when they
14 come into the room, that the patient is hard of
15 hearing or deaf.
16     Q.  Why is it important to have a sign to
17 alert them of that?
18     A.  If they come in and they're not
19 familiar with the patient, so that they know they
20 can effectively communicate with the patient.
21     Q.  If the sign is not present on the white
22 board, is there a concern that staff may not know
23 that the person is deaf?
24     A.  There is always that possibility, but
25 that should also be part of what's covered in their

Page 38

1  hand off communication.
2      Q.  So is a sign not necessary?
3      A.  I did not say that, but I'm saying it's
4  just a tool.
5      Q.  Okay.  And would that be noted anywhere
6  in the patient's records if this signage was
7  utilized?
8      A.  That I'm not aware.
9      Q.  Few pages down there's a slide that's
10 entitled:  Complete The Communication Assessment
11 Tool For Deaf and Hard of Hearing.  In here it
12 says:  "This form should be completed by the deaf
13 or hard of hearing person, placed in the chart and
14 updated as necessary."  Is this form typically
15 given to the deaf person to fill out?
16     A.  I'm not aware of the exact process of
17 how that occurs other than at registration.
18     Q.  These forms are not available at the
19 registration desk, correct?  These forms, the
20 communication assessment tool for deaf or hard of
21 hearing is not available at the registration desk,
22 correct?
23     A.  I did not say that.
24     Q.  So on this slide it says the form is
25 available in the deaf hard of hearing policy, page

Page 39

1  seven or through the house supervisor?
2      A.  Right.
3      Q.  So it's not at the registration desk?
4      A.  I believe it is at the registration
5  desk.
6      Q.  How do you know that?
7      A.  I have not verified that.
8      Q.  Okay.  And then on the next slide on
9  the next page, there's a question that says:
10 "Where can you find the communication assessment
11 tool for deaf or hard of hearing?  There's no
12 registration desk."  Answer:  "Option", correct?
13     A.  Not on this question, no.
14     Q.  Okay.  So people wouldn't be trained as
15 to that?
16     A.  No.
17     Q.  Okay.  Only two pages down there's the
18 procedure to follow for the deaf and hard of
19 hearing.  Is this training given to all staff at
20 Parkwest?
21     A.  I believe it was.
22     Q.  Okay.  So all staff should follow this
23 procedure?
24     A.  That is our process.
25     Q.  Okay.  So you don't make a distinction

Page 40

1  between social workers, or nurses, or doctors in
2  terms of the procedures to follow for deaf and hard
3  of hearing people?
4      A.  Well, it's basically for our employees.
5      Q.  Okay.  So anyone who's an employee?
6      A.  Yes.
7      Q.  And that would be people at
8  registration?
9      A.  It could be.
10     Q.  It could be nurses, social workers?
11     A.  Yes.
12     Q.  Okay.  This doesn't say only for
13 registration or triage, correct?
14     A.  Correct.
15     Q.  So it says:  "Procedure to follow for
16 deaf -- for the deaf and hard of hearing.  Step
17 one, complete communication assessment tool for
18 deaf or hard of hearing."  When a deaf or hard of
19 hearing patient, companion, designated
20 representative presence to the facility, complete
21 the communication assessment tool with the
22 individual and have him/her sign the form."  Why
23 does Parkwest want the patient to sign the form?
24     A.  Why do they want the patient to sign
25 the form?

Page 41

1      Q.  Yes.
2      A.  It's a way to verify that's what the
3  patient actually requested.
4      Q.  Okay.  And if the patient doesn't sign
5  the form, there's no way to verify that's what the
6  patient requested?
7      A.  Technically.
8      Q.  So the next sentence says:
9  "Communication assessment tool is attached to the
10  deaf or hard of hearing policy on Covenant."
11  What's Covenant?
12      A.  Covenant is our internal intranet.
13      Q.  Do all staff have access to Covenant?
14      A.  Pardon?
15      Q.  Do all staff at Parkwest have access to
16  Covenant?
17      A.  Yes, they do.
18      Q.  "Use of Stratus, video remote
19  interpreting service, may be useful in helping the
20  individual complete the form."  Why would use of
21  Stratus help -- be useful in helping an individual
22  complete the form?
23      A.  I am not sure.
24      Q.  So if a person who primarily speaks
25  American sign language presence and is given a

Page 42

1  form, you do not know why using Stratus would be
2  helpful for them in completing the form?
3      A.  Only if they had questions about the
4  form and they needed clarification.
5      Q.  Okay.  Are you aware if deaf people who
6  primarily speaking American sign language may have
7  trouble in communicating in English?
8      A.  I am not aware.
9      Q.  And then the next sentence says:
10  "Insure the form is put in the patient's medical
11  chart."  Why is that important?
12      A.  Yes.
13      Q.  Why is that important?
14      A.  Because a medical record is a record of
15  their stay, and that's what leads the documentation
16  for the patient had requested, important
17  communication through other caregivers.
18      Q.  Once this communication assessment tool
19  is filled out and put in the medical chart, would
20  all the medical staff have access to it?
21      A.  Yes.
22      Q.  If they recognize that the form was not
23  filled out, should they then follow this procedure
24  and insure that it's filled out?
25      A.  Can you rephrase that?

Page 43

1      Q.  If a medical staff member at Parkwest
2  looks at the medical record and sees that a deaf
3  person has presented and a communication assessment
4  tool has not been filled out, should they follow
5  this procedure and fill out the communication
6  assessment tool for that deaf or hard of hearing
7  patient?
8      A.  Preferably, yes.
9      Q.  That would be following your Parkwest
10  procedure?
11      A.  Yes.
12      Q.  There's no policy, or procedure or
13  practice that you're aware of at Parkwest that if a
14  deaf person refuses a VRI they are -- and prefers
15  an in-person interpreter, they won't get an
16  in-person interpreter because they refused the VRI?
17      A.  Repeat it again.  I just want to make
18  sure I answer correctly because...
19      Q.  Sure.  Are you aware of any practice,
20  policy or procedure at Parkwest which informs staff
21  that if a deaf person declines to use a VRI and
22  prefers an in-person interpreter, that because they
23  declined the VRI they are not entitled to an
24  in-person interpreter?
25      A.  Absolutely not.

Page 44

1      Q.  And why would they still be entitled to
2  an in-person interpreter even if they declined the
3  VRI?
4      A.  They still require effective
5  communication.
6      Q.  Do you know if staff are informed of
7  the limitations of utilizing note writing over a
8  sign language interpreter with a deaf person?
9      A.  I am not aware.
10      Q.  Do you know if writing is slower than
11  utilizing an interpreter?
12      A.  If writing is what?
13      Q.  Slower?
14      A.  I do not know.
15      Q.  Step 3 on this form it says:  "If an
16  on-site interpreter is requested, use Stratus until
17  the on-site interpreter arrives.  Insure that the
18  deaf or hard of hearing person understands that
19  Stratus is only temporary until the on-site
20  interpreter arrives at the facility."  Is that a
21  procedure that staff should follow for deaf or hard
22  of hearing patients?
23      A.  Normally, if they have requested an
24  on-site interpreter.
25      Q.  Do you know what the typical time is?

Page 45

1  How many hours it takes on average to get in-person
2  interpreter?
3      A.  No, I do not.
4      Q.  Has it ever been brought to your
5  attention that it takes too long to get an
6  in-person interpreter?
7      A.  No, it has not.
8      Q.  Okay.  Do you know if Parkwest has
9  contracts with more than one sign language
10 interpreting company to provide services?
11     A.  We normally use Knoxville Center For
12 The Deaf.
13     Q.  Does Parkwest have any other contracts
14 that you're aware of?
15     A.  I think Covenant has a contract with
16 VCI, but I'm not sure that we've used them at
17 Parkwest.
18     Q.  Is that to be used as a backup in case
19 Knoxville can't cover it?
20     A.  I believe so.
21     Q.  Okay.  And as far as you're aware, VCI
22 has not been called?
23     A.  No.
24     Q.  Step 4:  "Update white boards and
25 signage.  White boards and patient frames will have

Page 46

1  signage that indicates patient, companion,
2  designated representative is hard of hearing to
3  assist staff to know to identify themselves when
4  entering the room.  Place a note next to the
5  patient's call light button at the nurses' station
6  to identify that patient, companion, designated
7  representative is deaf or hard of hearing."  Why
8  would you need to place a note next to the
9  patient's call light button?
10     A.  When the patient calls out, if they
11 can't hear, you can't -- you have to go to the room
12 to respond instead of answering through the call
13 light.
14     Q.  Is one of the reasons why patients use
15 the call button is to communicate they're in pain?
16     A.  That would be one.  Could be one
17 reason.
18     Q.  The next page is:  "Effective
19 communication must occur with the following
20 individuals; number one, deaf or hard of hearing
21 patient."  What is Parkwest's understanding of
22 effective communication, what that means?
23     A.  I believe we had discussed that earlier
24 in regard to where effective communication is where
25 I can communicate what's going to happen and then

Page 47

1  the patient understands what's going to happen.
2      Q.  Okay.
3      A.  And it's a two-way street.
4      Q.  Has effective communication being able
5  to get the gist across or summary of the
6  information or all of the information that a
7  hearing person who spoke English would get?
8      A.  It should be whatever the patient needs
9  to be able to make any decisions that they have
10 about their care or treatment.
11     Q.  And is that that they should have the
12 equivalent amount of information as a hearing
13 person who speaks English?
14         MR. YOUNG:  Asked and answered.
15     A.  Yes.
16     Q.  Does whether a person receives
17 effective communication have anything to do with
18 whether they ultimately get good treatment or not?
19         MR. YOUNG:  I'm sorry, could you repeat
20 that question?
21     Q.  I'll rephrase.  So if a person has a
22 good medical outcome, that doesn't necessarily mean
23 that they had effective communication throughout
24 their care.  Is this right?
25         MR. YOUNG:  Object to the form.  Calls

Page 48

1  for speculation, but go ahead.
2         Go ahead.
3      A.  I think that still would be an opinion.
4      Q.  Okay.  My question is:  Does effective
5  communication have anything to do with medical
6  outcome?
7         MR. YOUNG:  Object to the form.
8         Go ahead, to the extent you can answer.
9      A.  No, because I don't know, like I said,
10 it's still my opinion one way or the other.
11         MR. YOUNG:  Yeah.  I think it's what?
12     A.  I don't have any knowledge of...
13     Q.  What's your opinion?
14     A.  My opinion?
15     Q.  Yes.
16         MR. YOUNG:  Objection.  Lack of
17 foundation, but go ahead.
18     A.  It's, basically, that it could, but it
19 might not.
20     Q.  Okay.  Let's go to the next page.
21 "Accommodating the deaf or hard of hearing.
22 Effective communication is critical in healthcare.
23 Miscommunication may lead to misdiagnosis or
24 unwanted treatment."  Is that the position of
25 Parkwest?

Case 3:19-cv-00041-DCLC-HBG   Document 35-8   Filed 02/28/20   Page 13 of 26   PageID #:
677

Page 49

1    A.  Yes.

2    Q.  Do you know why it says
3  miscommunication may lead to misdiagnosis or
4  unwanted treatment?

5    A.  I believe because that is a potential.

6    Q.  A potential what?

7    A.  That it could occur.

8    Q.  Why is that?

9    A.  Just with any communication, if you
10  have miscommunication it could lead to
11  misunderstandings.

12    Q.  Do you agree that even one word that is
13  mis communicated could result in a negative
14  outcome?

15    A.  There is that possibility.

16    Q.  Okay.  Do Parkwest staff receive any
17  other training, other than this computer based
18  learning module, regarding accommodating deaf or
19  hard of hearing individuals?

20    A.  That is what we currently have.

21    Q.  Is that all that you currently have for
22  the last three years?

23    A.  Yes.

24    Q.  And are all staff required to do this
25  module every year?

Page 50

1    A.  Yes.

2    Q.  This particular one?

3    A.  Yes.

4    Q.  Okay.

5      (A recess transpired.)

6    Q.  I want you to go to the answer which is
7  Exhibit P-6.  And go to Paragraphs 76 and 77.
8  When's the last time you reviewed the Affordable
9  Care Act or the regulations therein?

10    A.  To the best of my recollection, it
11  would have been either the end of 2016 or the first
12  of 2017.

13    Q.  How were you made aware of the
14  regulations, the new regulations of the Affordable
15  Care Act?

16    A.  I believe there was communication sent
17  out electronically.  And I do not remember if it
18  came from risk management or if it was something
19  that we received via, like an outside source, like
20  the joint commission or CMS.

21    Q.  Okay.  Is it Parkwest's policy,
22  practice or procedure to only provide interpreting
23  services when an affirmative request is made from a
24  person who primarily speaks a language other than
25  English?

Page 51

1    A.  Only at the request?

2    Q.  Correct.  So, for instance, if a staff
3  member at Parkwest sees that the person is deaf and
4  is communicating in sign language, are they not to
5  offer interpreting services?  Do they have to wait
6  until a request is made before they do anything?

7    A.  No, you don't have to wait.

8    Q.  So should they offer?

9    A.  They could offer.

10    Q.  Do you know if it's encouraged,
11  recommended or a practice --

12    A.  I have no knowledge of what the staff
13  are actually practicing.

14    Q.  Okay.  And you don't know if they're
15  trained to do that?

16    A.  I do not know.

17    Q.  And why is it -- why shouldn't staff
18  just wait until a request is made before providing
19  an interpreter?

20    A.  Again, it's part of being able to
21  effectively communicate with your patient.

22    Q.  And why would just waiting until a
23  request is made not contribute to effective
24  communication?

25    A.  Well, if they are not aware or able to

Page 52

1  communicate the care and treatment that they're
2  providing to the patient.

3    Q.  So waiting until a request is made
4  would not provide effective communication?

5    A.  It could impair it.

6    MR. ROZYNSKI:  I'll mark a copy of the
7  complaint as the next exhibit.

8      (Plaintiff's Exhibit 8, Complaint, was
9      marked for identification.)

10    Q.  Okay.  I want you to, in the marked
11  copy of the complaint, I want you to look at page
12  11 of this complaint.

13      I want you to go to Paragraph 64.  It
14  says: "Federal regulations implementing Section
15  1557 of the Patient Protection Affordable Care Act
16  provides that one covered entity shall offer a
17  qualified interpreter to an individual with limited
18  English proficiency, an oral interpretation is a
19  reasonable step to provide meaningful access for
20  that individual with limited English proficiency."

21      And two:  "A covered entity shall use a
22  qualified translator when translating written
23  content on paper or electronic form."  Does
24  Parkwest have any written policies or procedures in
25  place to insure that it can comply with this

Page 53

1  regulation?
2         MR. YOUNG:  I'll object to this line of
3  questions that cite laws that may not -- may call
4  for legal opinion or to the extent it may -- I
5  object to the lines of questions to the extent the
6  questions make assertions of law that are prior
7  context of that law, which may add additional
8  understanding of what is meant here and the full
9  text of what is being communicated.  To the extent
10 she can answer in her 30(b)(6) capacity, she can
11 address that.
12        MR. ROZYNSKI:  So does -- just repeat
13 the last question.
14        (The Court Reporter reads back the
15 requested text.)
16     A.  I believe that is the policies that
17 we've discussed already.
18     Q.  Which policy?  That says that Parkwest
19 shall offer a qualified interpreter to an
20 individual with limited English proficiency.
21     A.  The deaf and hard of hearing?
22     Q.  Yes.
23     A.  Yes.
24     Q.  Can you show me where in there it says
25 that staff should offer an interpreter?  You're

Page 54

1  looking at what exhibit?
2     A.  P-2.
3     Q.  Okay.
4     A.  On page two, Procedure C, if a deaf or
5  hard of hearing patient, companion/designated
6  representative requests a qualified interpreter,
7  the nursing unit or other patient care area will
8  contact the administrative supervisor, officer,
9  manager without unnecessary delay with the
10 information pertaining to."
11     Q.  Okay.  So that's when a deaf person
12 requests?
13     A.  Yes.
14     Q.  Where does it say in there that staff
15 should offer?
16     A.  Procedure A.  When we have that -- when
17 they come into the facility that we offer the
18 communication assessment tool for the deaf and hard
19 of hearing individuals.  So that's where we offer
20 them the option of what they -- any assistive
21 devices that they may need.
22     Q.  Okay.  So they say -- it says that they
23 may offer the tool, right?
24     A.  Yes.
25     Q.  And you're saying that this form is an

Page 55

1  offer of a qualified interpreter?
2     A.  It's an assessment tool to see what the
3  patient --
4     Q.  Is requesting?
5     A.  Is requesting or prefers.
6     Q.  Okay.  There's nothing in the policy
7  that tells Parkwest staff that they should
8  affirmatively offer a qualified interpreter to the
9  deaf person?
10        MR. YOUNG:  Objection.  Asked answer
11 answered.
12     Q.  You can answer.
13        MR. YOUNG:  I think it's already been
14 asked and answered.
15     A.  There's also a policy statement on page
16 one.
17     Q.  Okay.
18     A.  It says:  "Each facility or office
19 covered by this policy which in compliance with
20 applicable law make available auxiliary aides and
21 services to the individuals who are deaf or hard of
22 hearing when necessary to afford such individuals
23 and equal opportunity to access and benefit from
24 the facilities or offices services.
25     Q.  Okay.  Anywhere else where you believe

Page 56

1  that it says that Parkwest should offer qualified
2  interpreters to deaf individuals other than what
3  you've already testified to?
4     A.  I think that's it.
5     Q.  Okay.  And is there anywhere in
6  Parkwest policies or procedures which says that you
7  should use an interpreter to translate written
8  content for deaf individuals?
9         MR. YOUNG:  Objection.  Asked and
10 answered also.
11     Q.  Is there anywhere --
12     A.  Repeat that.
13     Q.  Is there anywhere in Parkwest's
14 policies or procedures which state that staff
15 should use an interpreter with deaf or hard of
16 hearing individuals for written content?
17     A.  Other than what we've already
18 discussed?
19     Q.  Okay.  So then there is no written
20 statement that says you have to use a qualified
21 interpreter for written content then?
22        MR. YOUNG:  Objection, that misstates
23 prior testimony.
24     Q.  So there is somewhere that says that
25 affirmatively?  Could you show me where?

Page 57

1    A.  Well, an example, on page four of the
2  policy.  This is specifically talking about
3  nonprofessional interpreters, but one of the things
4  that lists some of the information about
5  circumstances may be sufficiently lengthy or
6  complex required interpreter includes consent for
7  treatment, surgery or procedures, education-related
8  medication, discharge instructions, et cetera.
9    Q.  Okay.  So that's when you're using
10 family members as interpreters?
11   A.  No.  It's, basically, stating that --
12 it's under that section, that it states these are
13 circumstances that may be sufficiently lengthy or
14 complex to require an interpreter.
15   Q.  And this is advising people of that
16 when they're using family members as interpreters?
17   A.  Yes.
18   Q.  Okay.  And why is it that you should
19 use qualified interpreter when presenting consent
20 forms, even if family members are interpreting?
21   A.  Well, I think that's based on what's in
22 the policy talking about complexity and the nature
23 of the communication.
24   Q.  Okay.
25   A.  And the medical terminology.

Page 58

1    Q.  So is it Parkwest's position that
2  family members can not interpret consent forms?
3    A.  That's not what this said.
4    Q.  So it would be okay for family members
5  to interpret consent forms?
6    A.  If that is the patient's request.
7    Q.  Are you familiar with how Parkwest
8  insures that it's VRI has good internet connection?
9    A.  I know that's related to an IT issue
10 and IT stuff.  So I personally do not know how that
11 is.
12   Q.  Okay.  So you don't know how Parkwest
13 insures that its VRI has a good internet connection
14 at all times?
15   A.  No, I am not aware.
16   Q.  Okay.  Does Parkwest have any policies
17 or procedures that you're aware of that would
18 encompass Paragraph 66 where it says:  "The
19 Affordable Care Act provides that a covered entity
20 shall take appropriate steps to insure that the
21 communications with individuals with disabilities
22 are as effective as communications with others in
23 healthcare programs and activities."
24   MR. YOUNG:  I'm sorry, which is?
25   MR. ROZYNSKI:  Paragraph 66.

Page 59

1    MR. YOUNG:  I think that's been asked
2  and answered, but go ahead.
3    Q.  Is there anywhere --
4    MR. ROZYNSKI:  Could you repeat my last
5  question, sorry.
6    (The Court Reporter reads back the
7  requested text.)
8    A.  Other than what we've already
9  discussed?
10   Q.  Nothing else?
11   A.  Nothing else.
12   Q.  Has there been, you said that there's a
13 complaint database at Parkwest?
14   A.  Yes.
15   Q.  How does one get into the complaint
16 database in Parkwest?
17   A.  I don't know because I don't get into
18 it.
19   Q.  Okay.  So you have no idea how
20 complaints are lodged at Parkwest?
21   A.  Yes, I do.
22   Q.  How are they lodged?
23   A.  They either come through different
24 either letter or phone calls to our, normally, our
25 patient representative.

Page 60

1    Q.  Okay.  Does one have to fill out a
2  form, a grievance form?
3    A.  No.  I mean, they can use the form, but
4  it would either be a phone call or a written
5  letter.
6    Q.  Okay.  Did you personally search the
7  complaint database?
8    A.  Me personally, no.
9    Q.  Did you look for any complaints?
10   A.  Pardon?
11   Q.  Did you look for any complaints?
12   A.  I requested to see if we had any.
13   Q.  And did you find Mr. Tomei's Federal
14 lawsuit in your database?
15   A.  No, I did not.
16   Q.  So would a lawsuit not be contained in
17 that database?
18   A.  A lawsuit would not necessarily be in
19 the complaint database.  It would be based on if a
20 complaint had come through as either a complaint or
21 grievance to our patient rep.  Just because it's a
22 lawsuit would not necessarily have meant that it
23 gets put into that, because if there was no
24 official complaint lodged we would have not been
25 aware of that.

Page 61

1      Q.   Are you aware of an ADA Business Brief
2   entitled:  Communicating With People Who Are Deaf
3   or Hard of Hearing In Hospital Settings?
4      A.   I am not sure.
5      Q.   Okay.  Have you ever been made aware of
6   materials put out by the Department of Justice
7   which says that it's inappropriate to ask family
8   members or other companions to interpret for a
9   person who is deaf or hard of hearing because
10   family members may be unable to interpret
11   accurately in an emotional situation that often
12   exists in medical emergencies?
13          MR. YOUNG:  I'll object.  It calls for
14   a response that's not within the scope of the
15   30(b)(6) testimony, but go ahead.
16      A.   I am not absolutely sure.  I know that
17   when we first started working on the policy
18   revisions that we looked at some references and
19   stuff that I'm not -- it's been a while since I've
20   looked at it, so I do not have detailed knowledge.
21      Q.   Okay.  Are you responsible for paying
22   the VRI bills at Parkwest?
23      A.   No.
24      Q.   Do you know who's responsible for that?
25      A.   No, I do not.  I am not aware.

Page 62

1      Q.   Do you know who's responsible for
2   paying the Knoxville Center for the Deaf bills?
3      A.   I am not 100 percent sure.
4      Q.   Do you know who Carol Finley is?
5      A.   She's one of our house supervisors.
6      Q.   Does she still work at Parkwest?
7      A.   Yes.
8      Q.   Is she a nurse?
9      A.   Yes.
10      Q.   And where is she house supervisor?
11   What department?
12      A.   House supervisor is over the entire
13   hospital, her administrative supervisor.
14      Q.   Do you know what Unit 3 Riverstone is?
15      A.   Yes.
16      Q.   What's that?
17      A.   It's a cardiac specialty unit, special
18   procedure unit.
19      Q.   Are you familiar with how to look up
20   whether VRI was used at Parkwest on a given month?
21      A.   I have the ability to run some reports.
22   I'm not sure how detailed it is.
23          MR. ROZYNSKI:  I'll mark this Exhibit
24   9.
25          (Plaintiff's Exhibit 9, Stratus Case

Page 63

1   Report, was marked for identification.)
2      Q.   This is Plaintiff's Exhibit 9.  It's a
3   case report of Stratus.  Could you take a look at
4   this and tell me what this is?
5      A.   Okay.
6      Q.   Do you know what that is?
7      A.   Yes.  It's one of the reports that can
8   be run.  I'm not sure.  It looks like it was ran on
9   February the 12th through October 2017.
10      Q.   Do you know if this is the times VRI
11   was used for sign language during that month?
12      A.   Since I'm not sure, that's what it
13   appears to be, but I don't know if it's 100 percent
14   accurate.
15      Q.   Okay.
16          MR. ROZYNSKI:  I don't have any other
17   questions.
18   EXAMINATION BY MR. YOUNG:
19      Q.   Okay.  Let's start with the case
20   report.  Is that a case report for issues in
21   interpretation during the month of October 2017?
22      A.   I believe it is.
23      Q.   Okay.  So that's not the number of
24   times Stratus has been used?
25      A.   No.

Page 64

1      Q.   That's a report you can run to insure
2   whether or not there's problems listed.  Is that
3   true?
4      A.   Correct.
5      Q.   Okay.  And look at Exhibit P-9?
6      A.   Yes.
7      Q.   Okay.  Now, with regard to Stratus
8   itself, this is a system that was put in in 2017?
9      A.   Yes.
10      Q.   Okay.  And did we upgrade our IT or do
11   we do things with IT to insure that it would
12   function properly?
13      A.   Yes.
14      Q.   Have you received reports of it not
15   operating correctly?
16      A.   No, I have not.
17      Q.   What was the goal of putting Stratus
18   in?
19      A.   We had a previous system in place and
20   the Stratus system was more robust, and it was also
21   easier for staff to use, and also easier for
22   patients to use and see.  Before what we had, it
23   was more just like, almost like a TV on a stand.
24   And with the Stratus it's more an iPad on an
25   adjustable stand so it can be moved to where, if

**Page 65**

1 the patient's laying down in the bed, or sitting up
2 in the bed, or however, so it's easier for the
3 patient to actually see.
4     **Q. Is it dedicated solely to translator**
5 **functions?**
6     A. Yes.
7     **Q. Okay. On page three of the policy,**
8 **what does that say?**
9     A. "After consultation with the individual
10 who is deaf or hard of hearing, make available
11 auxiliary aides and services to afford such
12 individual an equal opportunity to access and
13 benefit from the facilities services."
14     **Q. It says make available. Is that**
15 **synonymous to offer to?**
16     A. I believe so.
17     **Q. This is training we provide to our**
18 **employees?**
19     A. Yes.
20     **Q. And here the employees are being**
21 **trained to offer auxiliary aides and services to**
22 **afford equal opportunity to access benefits of the**
23 **facility's services?**
24     A. Yes.
25     **Q. Would that include -- this is part of a**

**Page 66**

1 hearing -- hard of hearing individuals training,
2 right?
3     A. Correct.
4     **Q. So here they're being trained to offer**
5 **auxiliary services to the hard of hearing?**
6     A. Yes.
7     **Q. That would include interpreters?**
8     A. Yes.
9     **Q. Okay. With regard to this form, the**
10 **form is supposed to be filled out and is supposed**
11 **to be put in the chart. Is that right?**
12     A. Correct.
13     **Q. Now, you were asked a number of**
14 **questions about every caregiver has to do their own**
15 **form?**
16     A. No.
17     **Q. Okay. So that should be done once and**
18 **put in the chart?**
19     A. Correct.
20     **Q. So everybody knows what supposed to be**
21 **offered?**
22     A. Correct.
23     **Q. Okay. With regard to how you keep**
24 **yourself up-to-date with regard to the compliance**
25 **of our policies with various Federal laws and**

**Page 67**

1 statutes, you do your own investigation, correct?
2     A. Correct.
3     **Q. But do you also rely on the advice of**
4 **counsel employed by Covenant Health?**
5     A. Yes.
6     **Q. Covenant Health has its own general**
7 **counsel, lawyers, that are employed by it. Is that**
8 **correct?**
9     A. Correct.
10     **Q. And do you work with them in**
11 **formulating policies?**
12     A. Absolutely.
13     **Q. Making your sure they're up-to-date and**
14 **in compliance?**
15     A. Yes.
16     **Q. And this policy which you're familiar**
17 **with is some of that advice and investigation and**
18 **conclusion. Is that right?**
19     A. Correct.
20     **Q. Could we see that form again?**
21     MR. YOUNG: All right. I'm going to
22 meet with my co-counsel. We may be done.
23     (A recess transpired.)
24     MR. YOUNG: I think we're done.
25     (Deposition was concluded at 5:00 p.m.)

**Page 68**

1     C E R T I F I C A T E
2 STATE OF TENNESSEE
3 COUNTY OF KNOX
4     I, Catherine Golembeski, Licensed Court
5 Reporter and Registered Professional Reporter, do
6 hereby certify that I reported in machine shorthand
7 the deposition of SHARON MONDAY, called as a
8 witness at the instance of the Plaintiff, that the
9 said witness was duly sworn by me; that the reading
10 and subscribing of the deposition by the witness
11 was waived; that the foregoing pages were
12 transcribed under my personal supervision and
13 constitute a true and accurate record of the
14 deposition of said witness.
15     I further certify that I am not an attorney
16 or counsel of any of the parties, nor an employee
17 or relative of any attorney or counsel connected
18 with the action, nor financially interested in the
19 action.
20
21         *Cathy J. Golembeski*
        Catherine Golembeski, LCR# 778
22         Registered Professional Reporter
23
24
25

**1**

**1** 13:3
**10** 12:15 15:10,21
**100** 62:3 63:13
**11** 12:16 16:9 52:12
**12/13/19** 12:1
**12th** 63:9
**1557** 52:15
**17th** 4:5
**1st** 12:25 13:25 14:20

**2**

**2** 20:11 26:2
**20** 9:15
**2016** 17:3,7 50:11
**2017** 7:2,3 12:25 13:3 14:1,20 50:12 63:9,21 64:8
**2018** 13:8
**2019** 4:5
**2300** 4:7
**24** 29:7,9,18,19
**24/7** 29:11,12,14 30:1,13
**2:48** 5:2

**3**

**3** 44:15 62:14
**30(b)(6)** 23:21 24:3 53:10 61:15
**30(b)6** 8:15 11:23 12:5
**37804** 7:24
**37901** 4:8

**4**

**4** 11:23 12:4 45:24

**41** 9:4
**42** 8:10

**5**

**5** 11:25
**5:00** 67:25

**6**

**6** 15:15,17,22
**64** 52:13
**66** 58:18,25

**7**

**7** 28:10 34:4 36:12
**722** 7:23
**76** 12:16 15:24 50:7
**77** 12:16 15:24 50:7

**8**

**8** 52:8
**800** 4:6

**9**

**9** 62:24,25 63:2

**A**

**abilities** 19:13
**ability** 62:21
**absolutely** 43:25 61:16 67:12
**access** 17:23 36:20 41:13,15 42:20 52:19 55:23 65:12,22
**accommodate** 10:11
**accommodating** 10:4 11:5 14:13
**accommodation** 29:23 30:8
**accurate** 26:22 63:14
**accurately** 61:11
**Act** 9:24 10:8,15 17:3,8 19:11 26:12,16 50:9,15 52:15 58:19
**activities** 58:23
**ADA** 61:1
**add** 53:7
**additional** 53:7
**address** 7:19,21 53:11
**adjustable** 64:25
**administrative** 54:8 62:13
**admission** 18:10 19:13,24
**adult** 34:5
**advice** 67:3,17
**advisable** 25:21
**advising** 57:15
**affirmative** 50:23
**affirmatively** 19:12 55:8 56:25
**afford** 55:22 65:11,22
**Affordable** 9:23 10:8,14 17:3,8 19:10 26:12,16 50:8,14 52:15 58:19
**afternoon** 5:8
**agency** 14:19
**agents** 14:18
**agree** 49:12
**agreed** 4:11,20
**agreement** 34:17
**agrees** 34:10

**ahead** 24:12,15 27:10 48:1,2,8,17 59:2 61:15
**aides** 20:9 21:3 55:20 65:11,21
**alert** 37:13,17
**American** 18:8 41:25 42:6
**amount** 47:12
**and/or** 14:18
**Andrew** 5:10
**answering** 23:14 46:12
**appears** 63:13
**applicable** 55:20
**area** 12:19 13:16, 18,21 15:3,9 16:4, 8 54:7
**areas** 12:11,14 14:16 15:20 25:14
**Arnett** 4:6
**arrives** 44:17,20
**ASL** 14:19
**assertions** 53:6
**assess** 25:3
**assessment** 18:15 19:12,17,21 20:1,6,24 21:14 33:9,11,13 38:10, 20 39:10 40:17,21 41:9 42:18 43:3,6 54:18 55:2
**assessments** 24:19
**assigned** 11:14, 16,17
**assist** 46:3
**assistance** 26:16 34:11
**assistive** 54:20
**attached** 13:14 41:9
**attention** 45:5
**attorney** 12:21

13:18 15:11,13
**auxiliary** 55:20 65:11,21 66:5
**availability** 30:25 31:15
**average** 45:1
**aware** 6:6 10:10 16:20 17:7 18:14 19:10,14,15 26:14, 15,23 27:13 33:8 34:23 37:1 38:8,16 42:5,8 43:13,19 44:9 45:14,21 50:13 51:25 58:15, 17 60:25 61:1,5,25

**B**

**back** 13:9 21:20 24:7 27:20 28:5 32:18,24 53:14 59:6
**backup** 45:18
**based** 14:7,9,13, 23 22:4 23:14 27:23 28:17 30:25 32:7 34:16 36:11 49:17 57:21 60:19
**basically** 15:2 26:6 36:3 40:4 48:18 57:11
**Baum** 5:11
**bed** 65:1,2
**began** 5:2
**behalf** 12:10
**benefit** 55:23 65:13
**benefits** 65:22
**bills** 61:22 62:2
**bit** 28:1
**board** 36:22 37:3, 22
**boards** 45:24,25
**break** 7:15
**brought** 45:4
**Business** 61:1

SCOTT ALLEN TOMEI vs PARKWEST MEDICAL CENTER and COVENANT HEALTH
Monday, Sharon - 12/17/2019
Index: button..desk

**button** 46:5,9,15

**C**

**call** 12:5 46:5,9,12, 15 53:3 60:4

**called** 5:4 45:22

**calls** 46:10 47:25 59:24 61:13

**capacity** 53:10

**caption** 4:18

**cardiac** 62:17

**care** 9:9,23 10:8, 15 17:3,8 18:8 19:11 26:12,16 47:10,24 50:9,15 52:1,15 54:7 58:19

**caregiver** 66:14

**caregivers** 42:17

**Carol** 62:4

**case** 5:22 23:6,9 45:18 62:25 63:3, 19,20

**Catherine** 4:8,12

**CBL** 11:7,14 14:3, 5,6 28:5,7,11,15, 17 34:3 37:4,5

**Center** 5:13 8:6,25 15:16,18,23 45:11 62:2

**certificate** 4:18

**certified** 26:13,20

**cetera** 57:8

**CH80850050** 21:1

**Chapel** 7:23

**chart** 38:13 42:11, 19 66:11,18

**check** 26:20

**Circle** 7:23

**circumstances** 30:25 34:12,14 35:10 57:5,13

**cite** 53:3

**Civil** 4:4 23:13

**clarification** 42:4

**clarify** 21:7

**clear** 6:12,14 15:20 21:17

**clock** 30:1

**close** 9:15

**CMS** 9:20 50:20

**co-counsel** 67:22

**commission** 9:20 50:20

**communicate** 17:10,15 18:7 25:2,4 34:17,20 35:24 36:1 37:20 46:15,25 51:21 52:1

**communicated** 49:13 53:9

**communicating** 42:7 51:4 61:2

**communication** 12:24 17:1,23 18:15 19:9,13 20:5,9,24 21:3 24:19,24 25:3 27:13,24 30:18 33:9,10 34:7 35:11,14,22,23 38:1,10,20 39:10 40:17,21 41:9 42:17,18 43:3,5 44:5 46:19,22,24 47:4,17,23 48:5,22 49:9 50:16 51:24 52:4 54:18 57:23

**communications** 34:5,25 35:4,5,7 58:21,22

**companion** 20:8, 23 40:19 46:1,6

**companion/ designated** 21:2 54:5

**companions** 10:4 12:25 13:25 14:14 16:22 17:10,14,22 18:6 61:8

**company** 22:18 45:10

**company's** 22:22

**complaint** 16:13 52:7,8,11,12 59:13,15 60:7,19, 20,24

**complaints** 16:14 59:20 60:9,11

**complete** 38:10 40:17,20 41:20,22

**completed** 38:12

**completeness** 15:14

**completing** 42:2

**complex** 57:6,14

**complexity** 27:23 57:22

**compliance** 8:13, 20,23 9:6,23 10:20 19:5 55:19 66:24 67:14

**compliant** 9:19

**Complies** 12:8

**comply** 52:25

**computer** 14:12, 23 36:11 49:17

**computerized** 14:7,9

**concern** 37:22

**concerned** 31:9, 11

**concluded** 67:25

**conclusion** 67:18

**conducted** 26:21

**conference** 8:18

**connection** 5:22 58:8,13

**consent** 57:6,19 58:2,5

**considered** 29:23

**consultation** 65:9

**contact** 14:19 25:5,7,9 54:8

**contacted** 25:17

**contained** 60:16

**content** 10:23 52:23 56:8,16,21

**context** 53:7

**continuous** 14:6

**continuously** 30:1

**contract** 45:15

**contracts** 45:9,13

**contribute** 51:23

**copy** 12:6 52:6,11

**corporate** 11:15, 18 12:10

**correct** 12:18 13:20 14:24 16:5,9 33:16 36:9 37:6 38:19,22 39:12 40:13,14 51:2 64:4 66:3,12,19,22 67:1,2,8,9,19

**correctly** 43:18 64:15

**costly** 29:2

**counsel** 10:2 11:8 16:3 67:4,7

**court** 4:13 6:9 7:7 21:20 24:7 32:18 53:14 59:6

**Covenant** 8:9,24 10:15 12:11 20:12 28:10,15 41:10,11, 12,13,16 45:15 67:4,6

**cover** 45:19

**coverage** 31:9

**covered** 37:25 52:16,21 55:19 58:19

**critical** 48:22

**current** 8:5,11 9:14

**D**

**database** 59:13, 16 60:7,14,17,19

**date** 7:1 10:14

**dated** 12:1

**day** 4:5 29:7,9,18, 19

**deaf** 12:24 13:24 14:13 18:6 19:12, 17 20:6,13,22,25 28:15 29:3 31:19 32:3,12 35:19 37:9,15,23 38:11, 12,15,20,25 39:11, 18 40:2,16,18 41:10 42:5 43:2,6, 14,21 44:8,18,21 45:12 46:7,20 48:21 49:18 51:3 53:21 54:4,11,18 55:9,21 56:2,8,15 61:2,9 62:2 65:10

**Deaf/hard** 28:11 36:12

**December** 4:5

**decisions** 47:9

**declined** 43:23 44:2

**declines** 43:21

**declining** 33:4

**dedicated** 65:4

**defend** 34:8

**Defendant** 14:17

**Defendant's** 12:22 13:22 15:4

**delay** 54:9

**department** 61:6 62:11

**depend** 11:2

**depending** 29:23 31:14 35:10

**deposed** 5:6

**deposition** 4:2,11 5:14,15,18 6:2 67:25

**designated** 20:8, 23 25:14 40:19 46:2,6

**desk** 38:19,21 39:3,5,12

detailed 61:20 62:22

developed 11:7,9

devices 54:21

director 9:9

disabilities 58:21

discharge 57:8

discovery 4:4

discretionary 21:4,23

discuss 26:5

discussed 30:7 46:23 53:17 56:18 59:9

discussion 24:23 30:11,14

disseminated 11:11,19

distinction 39:25

doctors 30:18 40:1

document 12:3 33:24

documentation 42:15

Draper 4:6

duly 5:5

duties 9:17

---

**E**

e-mail 8:16 11:25

earlier 46:23

easier 64:21 65:2

educated 11:12

education 10:22 11:1,4 28:18

education-related 57:7

effective 12:23 16:25 19:9 35:21, 23 44:4 46:18,22, 24 47:4,17,23 48:4,22 51:23 52:4

58:22

effectively 27:12 37:20 51:21

effort 11:8

Eisenberg 5:11

electronic 52:23

electronically 50:17

emergencies 61:12

emotional 61:11

employed 67:4,7

employee 40:5

employees 14:18 40:4 65:18,20

employer 8:5

encompass 58:18

encouraged 51:10

end 50:11

English 10:5,12 11:6 16:17,22 25:3 35:2,15,16 42:7 47:7,13 50:25 52:18,20 53:20

entering 46:4

entire 62:12

entities 19:11

entitled 36:12 38:10 43:23 44:1 61:2

entity 26:19 52:16, 21 58:19

equal 55:23 65:12, 22

equivalent 47:12

evaluation 31:23

exact 7:1 10:14 38:16

examination 5:1, 7 12:12,14,19 13:21 14:17 15:3, 9,21 16:5,8 63:18

examined 5:6

exhibit 11:23,25 12:4,7 15:15,17 20:11,17 26:2 28:7,9,10 34:4 36:12 50:7 52:7,8 54:1 62:23,25 63:2 64:5

exists 61:12

expect 7:13

expert 23:11

Explain 29:9

expressly 4:19

extent 21:6 48:8 53:4,5,9

---

**F**

face-to-face 31:16

facilitate 34:5,7

facilities 55:24 65:13

facility 11:3 20:24 40:20 44:20 54:17 55:18

facility's 65:23

false 6:5

familiar 16:15 17:2 26:11 37:19 58:7 62:19 67:16

family 15:6 25:21 26:9,17,21 27:19 28:4,22,25 33:3,6, 15,25 34:4,6,10, 11,16,19 57:10,16, 20 58:2,4 61:7,10

feasible 30:8 32:11

February 63:9

Federal 23:8,10, 12 52:14 60:13 66:25

filing 4:18

fill 18:17 33:4 38:15 43:5 60:1

filled 19:5,8 20:2 42:19,23,24 43:4 66:10

financially 29:2

find 39:10 60:13

fine 6:23

finish 6:16,18,20

Finley 62:4

firm 5:11

folks 10:22

follow 39:18,22 40:2,15 42:23 43:4 44:21

foremost 6:3

form 4:21 18:11, 15,16 19:5,8 20:1, 25 21:15,18 22:1, 5,14,17 24:10,20, 21 32:25 33:3,8, 16,17 38:12,14,24 40:22,23,25 41:5, 20,22 42:1,2,4,10, 22 44:15 47:25 48:7 52:23 54:25 60:2,3 66:9,10,15 67:20

formalities 4:17

formally 33:24

forms 17:17 38:18,19 57:20 58:2,5

formulating 67:11

foundation 48:17

frames 45:25

free 33:18,21

friend 34:6,10,12, 16

friends 15:6 34:4

full 53:8

fully 26:14

function 64:12

functions 65:5

---

**G**

Gay 4:6

general 9:16 67:6

generally 13:11 16:15

gist 47:5

give 7:10 12:6 29:15

goal 64:17

Golembeski 4:8, 12

good 5:8 22:13 47:18,22 58:8,13

grievance 60:2,21

ground 6:1

guess 9:8

guidance 26:16

guide 17:16

---

**H**

Hagood 4:6

hand 38:1

handing 28:14

handout 13:14

happen 46:25 47:1

happened 7:1,3,4

happening 7:2

hard 12:24 13:24 18:6 20:6,13,22,25 28:16 34:8 37:9,14 38:11,13,20,25 39:11,18 40:2,16, 18 41:10 43:6 44:18,21 46:2,7,20 48:21 49:19 53:21 54:5,18 55:21 56:15 61:3,9 65:10 66:1,5

head 7:9

Health 8:9,24 12:11 20:12 28:10, 15 67:4,6

**healthcare** 48:22 58:23

**hear** 46:11

**heard** 27:2,3

**hearing** 4:22 12:24 13:25 18:6 20:6,13,22,25 28:11,16 34:8 35:13 36:12 37:9, 15 38:11,13,21,25 39:11,19 40:3,16, 18,19 41:10 43:6 44:18,22 46:2,7,20 47:7,12 48:21 49:19 53:21 54:5, 19 55:22 56:16 61:3,9 65:10 66:1, 5

**helpful** 42:2

**helping** 9:20 41:19,21

**him/her** 40:22

**hold** 6:17,19 9:7 23:17

**home** 7:20

**honor** 26:8 31:21 32:2,5

**hospital** 9:23 14:18 61:3 62:13

**hours** 29:7,9,18, 19 45:1

**house** 9:11 25:5,7, 9,13,17 36:19 39:1 62:5,10,12

**housed** 25:15

**hundred** 26:25

**I**

**i.e.** 15:5

**idea** 59:19

**identification** 11:24 12:2 15:19 28:13 52:9 63:1

**identify** 20:7 21:1 46:3,6

**impair** 52:5

**implementing** 52:14

**important** 6:12 34:25 35:4,6,12,14 37:16 42:11,13,16

**improper** 22:21 23:1 24:1

**in-person** 14:11 25:16 31:20,24 32:3,13,20 33:12 43:15,16,22,24 44:2 45:1,6

**inappropriate** 61:7

**include** 65:25 66:7

**included** 11:8

**includes** 28:24 57:6

**including** 13:24

**individual** 34:8,9 40:22 41:20,21 52:17,20 53:20 65:9,12

**individuals** 11:5 20:7,25 28:12,16 46:20 49:19 54:19 55:21,22 56:2,8,16 58:21 66:1

**inform** 27:18 28:2

**information** 28:25 35:12 47:6, 12 54:10 57:4

**informed** 44:6

**informing** 28:21

**informs** 43:20

**instance** 5:4 6:25 33:1 51:2

**instructing** 22:24 23:5

**instructions** 57:8

**instructs** 25:20

**insure** 16:16,21 17:9,14,22 18:5 19:4,16 42:10,24 44:17 52:25 58:20 64:1,11

**insures** 58:8,13

**insuring** 6:13 11:11 12:23 19:9 36:21 37:2

**interactions** 35:14,15,18,20,22

**internal** 41:12

**internet** 58:8,13

**interpret** 26:18 27:12 33:7 34:1 58:2,5 61:8,10

**interpretation** 22:5 26:21 34:24 52:18 63:21

**interpretative** 35:8

**interpreter** 13:23 25:6,17 26:10,20 27:25 29:3 30:15, 17 31:1,17,20,25 32:4,14,20 33:2,5, 12 34:7 43:15,16, 22,24 44:2,8,11, 16,17,20,24 45:2,6 51:19 52:17 53:19, 25 54:6 55:1,8 56:7,15,21 57:6, 14,19

**interpreters** 15:5 16:16,21 18:3 25:22 26:6,13 27:19,22 28:4,23 30:13 31:2 56:2 57:3,10,16 66:7

**interpreting** 14:19 18:3 27:14 29:6,11,13,17 31:9 41:19 45:10 50:22 51:5 57:20

**intranet** 41:12

**investigation** 67:1,17

**involved** 9:22

**ipad** 64:24

**irrelevant** 24:1

**issue** 24:2 58:9

**issues** 10:20 63:20

**J**

**January** 12:25 13:3,25 14:20

**job** 9:6,7,16

**joint** 9:19 50:20

**Justice** 61:6

**K**

**knowledge** 48:12 51:12 61:20

**Knoxville** 4:7 45:11,19 62:2

**L**

**Lack** 48:16

**language** 16:18, 23 17:11,15,23 18:7,8 20:1 29:3 41:25 42:6 44:8 45:9 50:24 51:4 63:11

**Large** 4:10

**law** 5:11 53:6,7 55:20

**laws** 53:3 66:25

**lawsuit** 60:14,16, 18,22

**lawyer** 9:1

**lawyers** 67:7

**laying** 65:1

**lead** 48:23 49:3,10

**leads** 42:15

**learning** 14:7,9, 13,23 36:11 49:18

**legal** 10:2 11:8 53:4

**lengthy** 57:5,13

**letter** 59:24 60:5

**letters** 21:13

**level** 11:3,15,18

**Licensed** 4:13

**light** 46:5,9,13

**limitations** 44:7

**limited** 10:5,12 36:5,8 52:17,20 53:20

**lines** 53:5

**list** 28:18

**listed** 64:2

**lists** 57:4

**LLP** 4:6

**located** 32:11

**lodged** 59:20,22 60:24

**long** 7:14 8:7 9:3, 13 10:10 45:5

**looked** 13:19 61:18,20

**M**

**machine** 4:12

**made** 13:7 50:13, 23 51:6,18,23 52:3 61:5

**magnet** 36:15,16

**make** 9:18 15:25 29:10,16 39:25 43:17 47:9 53:6 55:20 65:10,14

**making** 6:11 67:13

**management** 11:9 50:18

**manager** 8:13,23 9:5,10 36:24 37:1 54:9

**mandate** 18:24 19:2,16,20

**mark** 15:15 52:6 62:23

**marked** 11:24 12:1,4 15:18,22 28:12 52:9,10 63:1

**married** 8:2

Maryville 7:23

materials 28:20 36:25 61:6

matter 5:12

meaningful 52:19

means 6:4 14:5 34:19 35:23 46:22

meant 53:8 60:22

medical 5:13 8:6, 25 15:16,18,23 17:8 26:18 35:14 42:10,14,19,20 43:1,2 47:22 48:5 57:25 61:12

medically 26:13, 19

medication 57:8

meet 67:22

member 26:9,18 33:3,6,15,25 34:6, 10,11,20 43:1 51:3

members 10:20 11:21 13:17 25:22 26:22 27:19 28:4, 22 29:1 57:10,16, 20 58:2,4 61:8,10

memory 6:22

met 30:8

middle 7:16

minutes 31:6

mis 49:13

miscommunicati on 48:23 49:3,10

misdiagnosis 48:23 49:3

misstates 56:22

misunderstandin g 31:18

misunderstandin gs 49:11

module 14:23 49:18,25

modules 11:19

Monday 4:2 5:3 7:20

month 62:20 63:11,21

moved 64:25

Moving 14:16

---

**N**

names 8:1

nature 27:23 57:22

necessarily 47:22 60:18,22

needed 29:6 30:14 42:4

negative 49:13

nod 7:9

non-certified 15:5

nonprofessional 26:6,9 27:22 57:3

Notary 4:9,14

note 44:7 46:4,8

noted 21:18 33:13 38:5

notes 4:15

notice 11:24 12:5

number 12:19 13:18,21 14:17 15:3,10,21 16:9 46:20 63:23 66:13

nurse 9:12 36:23, 24 37:1,2 62:8

nurses 30:18 40:1,10

nurses' 36:18 46:5

nursing 9:10 54:7

---

**O**

oath 6:4

object 21:6 22:17 47:25 48:7 53:2,5 61:13

objection 21:18,

22 23:25 48:16 55:10 56:9,22

objection's 21:18

objections 4:20 24:11

obtain 25:18

obtained 36:17

occasion 32:10

occur 46:19 49:7

occurs 38:17

October 7:2,3 63:9,21

off-the-record 8:18

offer 23:2,7,11 51:5,8,9 52:16 53:19,25 54:15,17, 19,23 55:1,8 56:1 65:15,21 66:4

offered 66:21

office 20:24 55:18

officer 54:8

offices 4:6 55:24

official 8:22 60:24

on-site 18:3 44:16,17,19,24

ongoing 11:16

online 11:19

operating 64:15

opinion 22:15,20 23:3,7,11 24:2,13 27:7 48:3,10,13,14 53:4

opportunity 55:23 65:12,22

option 34:21 39:12 54:20

options 17:24

oral 52:18

outcome 47:22 48:6 49:14

---

**P**

P-2 26:3 54:2

P-6 50:7

P-7 28:14

P-9 64:5

p.m. 5:2 67:25

pages 38:9 39:17

pain 46:15

paper 52:23

Paragraph 52:13 58:18,25

Paragraphs 12:16 15:24 50:7

Pardon 5:17 14:25 33:20 36:6 41:14 60:10

Parkwest 5:13,23 8:6,25 9:6 10:12, 13,16 11:10,21 12:10 14:11 15:15, 17,23 16:20 17:9, 13,21 18:5,9,15,24 19:4,15 24:20 25:20 27:17 28:2, 19 29:4,8,20 30:4, 19 31:21 32:2,25 33:3 35:1 37:8 39:20 40:23 41:15 43:1,9,13,20 45:8, 13,17 48:25 49:16 51:3 52:24 53:18 55:7 56:1,6 58:7, 12,16 59:13,16,20 61:22 62:6,20

Parkwest's 46:21 50:21 56:13 58:1

part 28:18 37:25 51:20 65:25

Parts 17:6

passed 9:24

patient 9:9 20:7, 22 21:1 24:23,24, 25 26:17 27:16 28:25 29:6,17 30:2,16 31:19 32:7,12 33:1 35:25 36:8 37:14,19,20

40:19,23,24 41:3, 4,6 42:16 43:7 45:25 46:1,6,10,21 47:1,8 51:21 52:2, 15 54:5,7 55:3 59:25 60:25 65:3

patient's 26:8 38:6 42:10 46:5,9 58:6 65:1

patients 10:4 12:24 13:25 16:22 17:10,14,18,22 18:6 29:3 35:13 37:10 44:22 46:14 64:22

paying 61:21 62:2

people 10:11 35:19 39:14 40:3,7 42:5 57:15 61:2

percent 27:1 62:3 63:13

person 10:25 19:3,18 24:13 32:3 33:6 37:23 38:13, 15 41:24 43:3,14, 21 44:8,18 47:7, 13,16,21 50:24 51:3 54:11 55:9 61:9

person's 19:12

personal 22:15 27:7

personally 10:21, 24 58:10 60:6,8

persons 14:14 16:17

pertaining 54:10

phone 59:24 60:4

place 10:16,17 13:3,10 17:16,17 46:4,8 52:25 64:19

Plaintiff 4:3 5:5

plaintiff's 11:23, 25 12:4 15:17,22 20:11 28:10 52:8 62:25 63:2

Plaza 4:7

point 7:9 17:5 19:16

SCOTT ALLEN TOMEI vs PARKWEST MEDICAL CENTER and COVENANT HEALTH
Monday, Sharon - 12/17/2019
Index: policies..requirement

**policies** 9:25
11:12 12:22 13:22
15:4 17:16 27:17
28:2,21 52:24
53:16 56:6,14
58:16 66:25 67:11

**policy** 10:15,18
13:1,2,3,19 15:8
16:24 19:22,25
21:10 22:4,19
25:23,25 27:21
38:25 41:10 43:12,
20 50:21 53:18
55:6,15,19 57:2,22
61:17 65:7 67:16

**position** 8:12 9:14
22:22 48:24 58:1

**possibility** 37:24
49:15

**posted** 37:3

**potential** 28:3,22
49:5,6

**potentially** 30:21,
22

**practice** 22:14
24:16,17 43:13,19
50:22 51:11

**practices** 24:10

**practicing** 51:13

**prefer** 27:24 33:6,
15

**Preferably** 43:8

**preference** 18:11
24:23 26:7

**preferences**
18:13

**preferred** 32:13

**prefers** 33:25
43:14,22 55:5

**prepare** 9:21
13:18 14:1 16:4,11

**prepared** 12:21
14:21 15:7,10
16:1,8

**presence** 20:23
40:20 41:25

**present** 4:16
12:25 13:4,6 14:1,

20 37:21

**presented** 43:3

**presenting** 57:19

**previous** 9:10
64:19

**primarily** 41:24
42:6 50:24

**primary** 16:18,23
17:11,15,23 18:7

**prior** 9:5,11 10:14
53:6 56:23

**privilege** 23:4,15

**problem** 22:6

**problems** 64:2

**procedure** 4:5
20:20 21:4,7,10
23:13 39:18,23
40:15 42:23 43:5,
10,12,20 44:21
50:22 54:4,16
62:18

**procedures** 11:13
12:22 13:22 15:4
20:21 27:18 28:3,
21 40:2 52:24
56:6,14 57:7 58:17

**proceedings** 5:2

**process** 19:17,24
38:16 39:24

**produced** 8:15
12:9,14

**professional** 4:9,
13 33:2,5,11

**proficiency** 10:5,
12 52:18,20 53:20

**programs** 58:23

**properly** 64:12

**Protection** 52:15

**provide** 16:21,25
18:3 29:2,8,10,11,
21 30:4 34:10
45:10 50:22 52:4,
19 65:17

**provided** 16:17
17:25 29:14 30:1,
20,21,24 31:2,5
32:14,21

**providers** 17:9

**providing** 13:23
31:9 51:18 52:2

**provision** 13:24

**Public** 4:9,14

**pulled** 16:13

**punishment** 6:6

**purposes** 4:3

**pursuant** 4:4

**put** 11:9 42:10,19
60:23 61:6 64:8
66:11,18

**putting** 64:17

—————

**Q**

**qualified** 26:19
27:24 52:17,22
53:19 54:6 55:1,8
56:1,20 57:19

**question** 6:14,16,
18,19 7:16 21:16,
17,19 22:18,22
23:2,14,22,25
24:4,6 28:1 29:10
30:3 32:17 39:9,13
47:20 48:4 53:13
59:5

**questions** 4:21
42:3 53:3,5,6
63:17 66:14

—————

**R**

**ran** 63:8

**reads** 21:20 24:7
32:18 53:14 59:6

**reason** 46:17

**reasonable** 29:23
30:8,12 31:24
52:19

**reasons** 46:14

**receive** 49:16

**received** 50:19
64:14

**receives** 47:16

**recently** 17:4

**recess** 23:18 50:5
67:23

**recognize** 42:22

**recollection** 6:24
50:10

**recommendation**
27:4,6

**recommended**
51:11

**record** 6:13 7:19
8:17 14:4 15:20
26:1 42:14 43:2

**records** 38:6

**refer** 25:23 28:5

**references** 61:18

**referring** 20:17
21:11 26:2 27:20
32:24

**refused** 43:16

**refuses** 43:14

**regard** 10:22
12:15 18:12 19:7
46:24 64:7 66:9,
23,24

**Registered** 4:9,13

**registration**
18:10,18,20 19:19,
20,23 20:2 21:5
38:17,19,21 39:3,
4,12 40:8,13

**regulation** 53:1

**regulations** 17:3,
8 26:11 50:9,14
52:14

**regulatory** 8:13,
19,23 9:6,19 11:8

**related** 10:1 13:14
58:9

**relates** 11:5

**relation** 9:25
16:14

**relevant** 23:20

**reliance** 34:11

**rely** 67:3

**remember** 6:23
7:2 14:7 50:17

**remote** 18:2 31:2
41:18

**rep** 60:21

**repeat** 16:19
21:19 24:5 32:16
43:17 47:19 53:12
56:12 59:4

**rephrase** 42:25
47:21

**report** 63:1,3,20
64:1

**Reporter** 4:9,13,
14 21:20 24:7
32:18 53:14 59:6

**reporter's** 6:9

**reporters** 7:7

**reports** 62:21 63:7
64:14

**represent** 5:12

**representative**
12:10 20:23 40:20
46:2,7 54:6 59:25

**representatives**
14:18 20:8 21:2

**request** 4:3 17:18
24:25 26:8 30:12
32:3,8 33:17 50:23
51:1,6,18,23 52:3
58:6

**requested** 21:2,
21 24:8 29:14
30:4,5,10 31:19
32:19 34:9 41:3,6
42:16 44:16,23
53:15 59:7 60:12

**requesting** 20:8
55:4,5

**requests** 29:17
54:6,12

**require** 17:8 44:4
57:14

**required** 21:4,24
22:9,11 23:2,7,11
27:1 49:24 57:6

**requirement**
19:11

**requirements**
10:11

**requires** 16:20,24,
25

**reserved** 4:21

**respond** 46:12

**responds** 23:21

**response** 7:10
61:14

**Responsibilities**
20:13

**responsible**
10:19,21,24 11:1,
4,11 18:17,25 19:9
36:21 37:2,6
61:21,24 62:1

**result** 49:13

**review** 13:1 28:17

**reviewed** 14:3,9,
22 15:8 17:2 50:8

**revision** 13:7,12,
13

**revisions** 61:18

**Rights** 20:12

**risk** 11:9 50:18

**risks** 27:19 28:3,
22

**Riverstone** 62:14

**RN** 9:2,3

**robust** 64:20

**room** 7:9 32:11
37:14 46:4,11

**round** 30:1

**Rozynski** 5:7,10
8:14 21:9,16 22:2,
24 23:4,8,12,23
24:5 28:8 32:22
52:6 53:12 58:25
59:4 62:23 63:16

**rule** 11:23 12:5
23:8,10

**rules** 4:4 6:1 23:12

**run** 62:21 63:8
64:1

**— S —**

**scope** 24:4 61:14

**Scott** 5:12

**search** 60:6

**section** 52:14
57:12

**sees** 43:2 51:3

**sentence** 41:8
42:9

**separate** 14:12

**service** 25:18
41:19

**services** 13:23
17:18 29:7,11,12,
13,18 31:10 35:8
45:10 50:23 51:5
55:21,24 65:11,13,
21,23 66:5

**Settings** 61:3

**seventh** 36:11

**shake** 7:8

**Sharon** 4:2 5:3
7:20

**shorthand** 4:12

**show** 12:3 15:21,
23 53:24 56:25

**sides** 36:4,7

**sign** 18:8 29:3
37:16,21 38:2
40:22,23,24 41:4,
25 42:6 44:8 45:9
51:4 63:11

**signage** 36:13,22
37:9 38:6 45:25
46:1

**signature** 4:17

**single** 30:17

**sitting** 65:1

**situation** 29:24
61:11

**slide** 38:9,24 39:8

**slight** 13:7,12

**slower** 44:10,13

**smoothly** 6:2

**social** 40:1,10

**solely** 65:4

**source** 50:19

**speak** 11:6 12:20
16:17,22 25:2
35:2,15,16

**speaking** 20:17
23:21 42:6

**speaks** 41:24
47:13 50:24

**special** 62:17

**specialty** 62:17

**specific** 11:14
19:3

**specifically** 34:9
35:11 57:2

**speculation** 48:1

**spoke** 47:7

**staff** 9:12 10:20
11:12,21 12:23
13:17,23 14:19
15:6 16:16,21
17:17 25:21 27:18
28:2,21 30:19
35:1,5,24 36:1,7
37:13,22 39:19,22
41:13,15 42:20
43:1,20 44:6,21
46:3 49:16,24
51:2,12,17 53:25
54:14 55:7 56:14
64:21

**stand** 64:23,25

**standards** 9:19

**start** 63:19

**started** 61:17

**state** 4:10 7:18
14:4 20:5 56:14

**statement** 55:15
56:20

**states** 19:25 20:21
26:12,17 57:12

**stating** 57:11

**slower** 44:10,13

**station** 46:5

**stations** 36:19

**statutes** 67:1

**stay** 42:15

**step** 40:16 44:15
45:24 52:19

**steps** 58:20

**stop** 23:13

**Stratus** 41:18,21
42:1 44:16,19
62:25 63:3,24
64:7,17,20,24

**street** 4:7 47:3

**study** 19:7

**stuff** 10:23 29:25
58:10 61:19

**subject** 6:6 20:13

**sufficiently** 12:21
14:21 15:7 16:1
57:5,13

**summary** 47:5

**supervisor** 9:11
25:5,8,10,13,17
36:20 39:1 54:8
62:10,12,13

**supervisors** 62:5

**supposed** 16:16
66:10,20

**surgery** 57:7

**survey** 9:21

**swear** 4:14

**sworn** 5:5 6:3

**synonymous**
65:15

**system** 10:1,18
11:3,7 16:13 64:8,
19,20

**— T —**

**takes** 45:1,5

**taking** 6:9

**talk** 6:11 12:21
13:17 15:11 27:21,

22

**talked** 15:13 34:20

**talking** 16:3 18:16
21:14,15,25 31:16,
17 34:18 35:7
57:2,22

**talks** 14:13

**technical** 26:15

**Technically** 41:7

**telephone** 18:4

**telling** 27:15

**tells** 55:7

**temporary** 44:19

**Tennessee** 4:4,7,
8,10 7:24 23:6,9

**term** 21:8

**terminology**
57:25

**terms** 12:11 40:2

**test** 6:22

**testified** 56:3

**testify** 12:9 16:1,8

**testifying** 24:3

**testimony** 56:23
61:15

**text** 21:21 24:8
32:19 33:19,21
53:9,15 59:7

**thing** 14:8

**things** 7:7,9 9:20
10:3 22:23 57:3
64:11

**time** 7:15 44:25
50:8

**times** 31:3 58:14
63:10,24

**title** 8:22 9:7,8
21:9

**today** 6:12 12:9,
14,22 14:2,21
15:11 16:1,12

**Tomei** 5:12

**Tomei's** 60:13

**tool** 20:6,25 33:9, 11,13 38:4,11,20 39:11 40:17,21 41:9 42:18 43:4,6 54:18,23 55:2

**topics** 8:15

**touching** 4:17

**trained** 14:17 39:14 51:15 65:21 66:4

**training** 10:19 12:23 13:22 14:12 27:18 28:2,21 36:25 39:19 49:17 65:17 66:1

**transcribe** 4:15

**transcript** 6:11

**translate** 56:7

**translating** 52:22

**translator** 52:22 65:4

**transmission** 4:18

**transpired** 23:18 50:5 67:23

**treatment** 47:10, 18 48:24 49:4 52:1 57:7

**triage** 18:18,20 40:13

**trouble** 42:7

**true** 64:3

**truth** 6:4,5

**turn** 12:6

**TV** 64:23

**two-way** 47:3

**type** 9:20

**typewriting** 4:16

**typical** 44:25

**typically** 38:14

---

**U**

**uh-huh** 7:8 18:21

**ultimately** 47:18

**um-hum** 7:8

**unable** 61:10

**understand** 15:12 21:17 29:10,16

**understanding** 12:13,17 34:18 46:21 53:8

**understands** 44:18 47:1

**unit** 9:10 54:7 62:14,17,18

**unnecessary** 54:9

**unwanted** 48:24 49:4

**up-to-date** 66:24 67:13

**update** 13:15 45:24

**updated** 38:14

**upgrade** 64:10

**urge** 6:17

**utilized** 34:24 38:7

**utilizing** 44:7,11

---

**V**

**VCI** 45:16,21

**verbal** 7:10

**verbalization** 24:24

**verified** 39:7

**verify** 11:15 20:3 27:15 41:2,5

**video** 18:2 31:2 41:18

**VRI** 13:15,24 25:8, 10,14,16 29:25 31:8 32:10,13 33:2,5,12 43:14, 16,21,23 44:3 58:8,13 61:22 62:20 63:10

---

**W**

**wait** 51:5,7,18

**waiting** 51:22 52:3

**waived** 4:19

**waiver** 32:25

**wanted** 30:17

**ways** 6:24 24:18

**When's** 50:8

**white** 36:22 37:3, 21 45:24,25

**Wood** 7:23

**word** 49:12

**work** 10:22 62:6 67:10

**worked** 8:7,9 10:1,4,25

**workers** 40:1,10

**working** 61:17

**writing** 44:7,10,12

**written** 33:19,22 52:22,24 56:7,16, 19,21 60:4

---

**Y**

**year** 49:25

**years** 5:20,21,25 8:10 9:4,15 10:17 49:22

**YOUNG** 8:16 21:6, 12,22,25 22:3,17, 21 23:1,6,9,16,19, 24 24:11,15 27:9 28:7 32:16,20,23 47:14,19,25 48:7, 11,16 53:2 55:10, 13 56:9,22 58:24 59:1 61:13 63:18 67:21,24