# EXHIBIT  H

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF TENNESSEE

 3                  CASE NO. 3:19-cv-00041

 4

 5                       -  -  -

 6   SCOTT ALLEN TOMEI,                    :

 7                          Plaintiff,   :

 8        vs.                              :

 9   PARKWEST MEDICAL CENTER and           :

10   COVENANT HEALTH,                      :

11                          Defendants.:

12

13      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

14

15             DEPOSITION OF MICHAELA WHIDBY

16

17

18   =================================================

19        JEFF RUSK COURT REPORTING & VIDEO
             Registered Professional Reporters
20        Certified Legal Video Specialist

21

22     Catherine I. Golembeski, NJ-CCR, RPR, LCR
                805 Eleanor Street, N.E.
23           Knoxville, Tennessee 37917
                 (865) 246-7656
24           Jeff@JeffRusk.com           ORIGINAL

25
```

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4         ANDREW ROZYNSKI, ESQ.
           EISENBERG AND BAUM, LLP
 5         24 Union Square East, Fourth Floor
           New York, New York 10003
 6         (212) 353-8700
           arozynski@EandBLaw.com
 7

 8

 9
      FOR THE DEFENDANTS:
10
           BRODERICK L. YOUNG, ESQ.
11         DEVON LYON, ESQ.
           ARNETT, DRAPER & HAGOOD, LLP
12         800 S. Gay Street
           2300 First Tennessee Plaza
13         Knoxville, Tennessee 37901
           (865) 546-7000
14         byoung@adhknox.com

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2
     MICHAELA WHIDBY                                    PAGE
3

4    EXAMINATION BY MR. ROZYNSKI                          5

5    EXAMINATION BY MR. YOUNG                            33

6

7

8

9    NO.                 INDEX OF EXHIBITS              PAGE

10   Plaintiff's Exhibit 1   Medical Records           20

11   Plaintiff's Exhibit 2   Covenant Health Rights
                             and Responsibilities for
12                           Deaf and Hard of Hearing 28

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    D E P O S I T I O N

 2              The deposition of Michaela Whidby, taken at

 3      the request of the Plaintiff, for purposes of

 4      discovery, pursuant to the Tennessee Rules of Civil

 5      Procedure on the 17th Day of December, 2019, at the

 6      offices of Arnett, Draper & Hagood, LLP, 800 S. Gay

 7      Street, 2300 First Tennessee Plaza, Knoxville,

 8      Tennessee 37901 before Catherine Golembeski,

 9      Registered Professional Reporter and Notary Public

10      at Large for the State of Tennessee.

11              It is agreed that the deposition may be

12      taken in machine shorthand by Catherine Golembeski,

13      Licensed Court Reporter and Registered Professional

14      Reporter and Notary Public, and that she may swear

15      the witness and thereafter transcribe her notes to

16      typewriting and present to the witness for

17      signature, and that all formalities touching

18      caption, certificate, filing, transmission, etc.,

19      are expressly waived.

20              It is further agreed that all objections

21      except as to the form of the questions are reserved

22      to on or before the hearing.

23

24

25
```

```
 1                    EXAMINATION
 2          (Proceedings began at 1:11 p.m.)
 3               MICHAELA WHIDBY,
 4  called as a witness at the instance of the
 5  Plaintiff, having been first duly sworn, was
 6  examined and deposed as follows:
 7  EXAMINATION BY MR. ROZYNSKI:
 8          Q.   Good afternoon.  My name is Andrew
 9  Rozynski.  I'm with the law firm of Eisenberg and
10  Baum.  And I represent Mr. Tomei in the matter
11  against Parkwest.  I brought you here to take your
12  deposition.
13               Have you ever had your deposition taken
14  before?
15          A.   No.
16          Q.   Since it's your first time, I'm going
17  to go over some of the ground rules.  As you can
18  see, the court reporter is taking down everything
19  that we're saying.  And she's making a transcript
20  of this.
21          A.   Okay.
22          Q.   You are sworn to tell the truth.
23  You're under oath, which means that if you
24  willfully lie you could be subject to penalties.
25  Okay?
```

1        A.    Uh-huh.

2        Q.    It's really important that we have a

3  clear record.  So how we do that is that we give

4  affirmative responses.  It's things that court

5  reporter hate is when witnesses do things like

6  um-hum, or uh-huh, or shake their head, or nod

7  their head, or make grunts or point to things

8  without describing what they are.  So I'll ask that

9  you give verbal responses.  And if you're referring

10  to something that you state on the record what it

11  is you're referring to.  Okay?

12        A.    Okay.

13        Q.    All right.  Also it's not a memory

14  test.  So if you don't remember something, it's

15  perfectly fine to say that you don't remember.

16        A.    Okay.

17        Q.    Also too, I don't want you to guess.

18  So if you're guessing, please let me know.  And I'm

19  happy to, you know, rephrase the question, or ask

20  you a different question.  Okay?

21        A.    Okay.

22        Q.    However, I do want your best memory,

23  recollection or estimate.  So what that means is,

24  if I ask you when something happened and you

25  remember it happened in October of 2017, but you

1  don't know the exact date in October 2017, instead

2  of saying I don't remember when it happened, you

3  could say I believe it happened in October of 2017.

4  Do you understand?

5         A.   Yes.

6         Q.   Also too, I don't expect this to be a

7  very long deposition.  However, if you need to take

8  a break at any time, we can take a break.  I'll

9  just ask that you don't do that in the middle of a

10  question.  Okay?

11         A.   Okay.

12         Q.   Also, it's really important that you

13  just wait until I finish asking my question before

14  you answer the question.  Only because the record

15  won't be as clear if we're talking over each other.

16  And I'll do my best not to ask my next question

17  until you finish your answer.  Okay?

18         A.   Okay.

19         Q.   All right, great.  So we'll get

20  started.

21              Who's your current employer?  Well,

22  first, could you please state your name and address

23  for the record.

24         A.   Michaela Whidby, address is 932

25  Bradleyville Drive, Knoxville, Tennessee 37938.

1          Q.    And who's your current employer?

2          A.    Parkwest Medical Center.

3          Q.    And for how long have you worked there?

4          A.    About two years.

5          Q.    Okay.  And when did you start there?

6          A.    August of 2017.

7          Q.    And what is your current position

8    there?

9          A.    I'm a social worker.

10         Q.    And have you been a social worker since

11   you started working at Parkwest?

12         A.    Yes.

13         Q.    And where did you work prior to

14   Parkwest?

15         A.    I worked for Helen Ross McNabb in the

16   mobile crisis unit.

17         Q.    How long were you there for?

18         A.    About a year-and-a-half.

19         Q.    And prior to that, where did you work?

20         A.    I was in graduate school at UT.

21         Q.    Okay.  And what's the highest level of

22   education that you've obtained?

23         A.    Masters degree.

24         Q.    In social work?

25         A.    Yes.

1      Q.   Could you tell me a little bit about

2  your general job duties as a social worker at

3  Parkwest Medical Center?

4      A.   Yes.  So I am in charge of discharge

5  planning.  I primarily place people into placement

6  with skilled nursing facilities, rehab, that's my

7  primary workload.

8      Q.   All right.  Do you know who Scott Tomei

9  is?

10      A.   Yes.

11      Q.   Do you have a memory of him as you sit

12  here today?

13      A.   Yes.

14      Q.   Okay.  Is Mr. Tomei a deaf man?

15      A.   Yes.

16      Q.   Okay.  And I want to talk about your

17  training that you received when you first became an

18  employee of Parkwest Medical Center.  Okay?

19      A.   Uh-huh.

20      Q.   Is that a yes?

21      A.   Yes.

22      Q.   All right.  Briefly describe what your

23  training looked like when you first arrived at

24  Parkwest?

25      A.   My prior training or what, like?

1          Q.    Orientation or training, you know, that

2     kind of stuff?

3          A.    Yeah.  So we complete just, like, kind

4     of general training, on-the-job just to learn about

5     Parkwest Medical, their policies, procedures.  And

6     then we have a series of online programs that we

7     have to complete within a certain amount of months.

8          Q.    Okay.  How long was your orientation?

9          A.    Probably about two weeks.

10         Q.    Okay.  And during your orientation, did

11    you learn about providing language access to people

12    who don't speak English?

13         A.    Yes.

14         Q.    Okay.  Other than during your

15    orientation, did you receive any additional

16    training about providing language access to people

17    who don't speak English?

18         A.    Through the online programs that we

19    use.

20         Q.    Okay.  And how often do you receive

21    materials or training on that?

22         A.    Those are yearly.

23         Q.    Okay.  Have you ever had a patient who

24    spoke a language other than English?

25         A.    Yes.

1      Q.   What are the essential languages that

2  you've experienced?

3      A.   Mostly Spanish.

4      Q.   Do you speak Spanish?

5      A.   No.

6      Q.   Okay.  When you have a patient who

7  speaks Spanish, how do you communicate with that

8  patient?

9      A.   I mostly go in after, like, the nurse

10  or somebody else and kind of, depending on the

11  preference, if there's a live interpreter or if

12  there's family or we have a video interpreter

13  service.

14      Q.   Okay.  So for patients that speak

15  Spanish, you'll use a live interpreter, family

16  members or a video interpreter service?

17      A.   Uh-huh.

18      Q.   Is that a yes?

19      A.   Yes.

20      Q.   And how do you decide what you'll use?

21      A.   For my role it's -- I can use family

22  for discharge planning services.  I know that the

23  chart has a paper on what they can use too, or

24  normally, I just go to the nurse and ask them how

25  they've been communicating with them.

1          Q.   Okay.  So when you have people who

2     speak Spanish, you usually will go to family

3     members first?

4          A.   I will go in the room first.

5          Q.   And is it only if there are no family

6     members there that speak English then you'll get an

7     interpreter?

8          A.   Yeah.  Then I ask, usually, ask the

9     patient, once I have an interpreter, how they want

10    interpretive services.  If this means or if they

11    prefer another means.

12         Q.   Okay.  So during your training, you're

13    not trained on that it's typically inappropriate to

14    use family members as interpreters?

15         A.   No, that can be one of the, I think,

16    that could be one of the services, a member of the

17    family.

18         Q.   All right.  So you've never been

19    trained on what potential downfalls of using family

20    members as interpreters?

21         A.   I don't remember that specifically.

22         Q.   Okay.  And do you recall ever getting

23    any training that you should only use family

24    members in emergency situations?

25         A.   I think that's listed in the training.

1          Q.    Okay.

2          A.    I don't remember that right off the top

3    of my head.

4          Q.    Okay.  For someone who speaks Spanish,

5    why is it important to communicate with them in

6    their primary language?

7          A.    So, I guess, you can get directly from

8    the patient.

9          Q.    Okay.  What do you mean by that?

10         A.    Like whatever questions or whatever

11   answers you have.

12         Q.    And have you ever been trained that you

13   should only communicate with a patient in their

14   primary language?

15         A.    I don't know.

16         Q.    Okay.  Do you know how to get an

17   in-person interpreter?

18         A.    Yes.

19         Q.    How do you get an in-person

20   interpreter?

21         A.    We would go either to the charge nurse

22   who would contact the house supervisor.  And I

23   think they call it's Knoxville School for the Deaf

24   and they would dispatch somebody.

25         Q.    From the Knoxville School for the Deaf?

1          A.    I believe so.

2          Q.    Okay.  And have you ever utilized a

3    professional in-person interpreter before?

4          A.    Yes.  Not at the hospital, though.

5          Q.    Okay.  Outside the hospital, where have

6    you utilized one?

7          A.    When I was at mobile crisis, yeah.

8          Q.    Okay.  What kind of interpreter did you

9    use at mobile crisis?

10         A.    We would either use live or video.

11         Q.    Okay.  What languages?

12         A.    Spanish, and I think I had deaf at

13   mobile crisis too.

14         Q.    But you never had an in-person

15   interpreter at Parkwest so far, professional?

16         A.    I don't remember.

17         Q.    Okay.  How do you -- are you familiar

18   with something called Stratus?

19         A.    Yes.

20         Q.    What's Stratus?

21         A.    Online video interpreter that we use.

22         Q.    Okay.  Have you ever used Stratus

23   before?

24         A.    Yes.

25         Q.    When have you used Stratus?

1        A.    I've used it several times.

2        Q.    With what kind of languages?

3        A.    Mostly Spanish speaking.  That's all

4    that I can remember I've used it with.

5        Q.    You only remember using it for Spanish?

6        A.    Correct.

7        Q.    All right.  Have you ever been trained

8    that lipreading is often an unreliable form of

9    communication with a deaf person?

10       A.    I don't know.

11       Q.    Okay.  Have you had any training either

12   it's an appropriate way to communicate with nobody

13   or inappropriate way to communicate with someone,

14   lipreading?

15       A.    I'm not sure.

16       Q.    How about whether -- pros and cons of

17   writing with a deaf person instead of using

18   language such as sign language, have you been

19   trained one way or another if that's appropriate or

20   not appropriate?

21       A.    No.  I don't think, specifically, no.

22       Q.    Okay.  You said Mr. Tomei you knew him

23   to be a deaf man.  Is that correct?

24       A.    Yes.

25       Q.    Okay.  And did you ever -- do you

1    recall hearing his voice?

2          A.   No.

3          Q.   Do you know one way or the other if he

4    can speak intelligibly or not?

5          A.   No.

6          Q.   Did you observe him communicating with

7    his hands or using sign language?

8          A.   Yes.

9          Q.   Are you, yourself, familiar with sign

10   language?

11         A.   No. Well, I was taught the alphabet

12   when I was little, but I don't know it at all.

13         Q.   You don't remember it?

14         A.   No.

15         Q.   So you've already testified that you've

16   never used an in-person or you don't recall using

17   an in-person interpreter or using the Stratus for

18   sign language.  Is that correct?

19         A.   Correct.

20         Q.   All right.  Did you ever try to

21   communicate with Mr. Tomei?

22         A.   Not with him directly.  I communicated

23   with his wife.

24         Q.   Okay.  And did you understand his wife

25   to be deaf or hard of hearing?

```
 1          A.   Hard of hearing, yes.
 2          Q.   Okay.  And did you observe her using
 3   sign language with Mr. Tomei?
 4          A.   Yes.
 5          Q.   Okay.  How did you know that Mrs. Tomei
 6   knew sign language?
 7          A.   I just saw her communicating with him.
 8          Q.   Okay.  How many interactions did you
 9   have with Mrs. Tomei?
10          A.   I only recall one.
11          Q.   Okay.  And what do you recall -- what's
12   the first thing you recall about that interaction?
13          A.   I don't remember.
14          Q.   Okay.  And did you walk into the room?
15          A.   Yes.
16          Q.   Did you see -- do you have any specific
17   recollection of, like, a timeline of events when
18   you were in there?
19          A.   I probably introduced myself and said
20   why I was there and she must have replied to me.
21          Q.   Okay.  And what did -- you said -- but
22   you don't have a specific recollection of that.  Is
23   that right?
24          A.   Not exactly what I said or what
25   happened.
```

1          Q.   Okay.  All right.  Do you recall what

2     Mr. Tomei looks like?

3          A.   Vaguely, yes.

4          Q.   What does he look like?

5          A.   White male.  I don't recall him having

6     much hair, but maybe it was dark.  Maybe he had

7     facial hair.  That's all that I remember.

8          Q.   And do you recall what Mrs. Tomei

9     looked like?

10         A.   No.

11         Q.   Okay.  And so what do you remember

12    about that interaction, if anything?

13         A.   So I remember I went in there to do

14    discharge planning needs and see what he needs when

15    he goes home.  I was informed by the physical

16    therapist that he did not want to go to a rehab, he

17    wanted to go home.  I kind of already knew that

18    information because I went in right after her.

19              And so I remember introducing myself to

20    the wife.  And I'm pretty sure I vaguely remember

21    her telling him who I was and why I was there.  And

22    she must have replied to me.  I did my assessment

23    with her.

24         Q.   Okay.  And do you remember that

25    specifically, doing an assessment with her or you

1    said I must have?

2         A.   No, I did the assessment with her.  I

3    do remember that.

4         Q.   Okay.  What questions did you ask her?

5         A.   I can't remember specifically.  I can

6    tell you the questions I normally ask.

7         Q.   What are the questions you normally

8    ask?

9         A.   Like I ask, we try to get a baseline

10   where they were before they came in the hospital.

11   So I would have asked who they live with, are they

12   independent with, like, daily living things, you

13   know.  Do they drive?  Who their primary care

14   doctor is?  Any kind of light medical equipment

15   they used.  We're trying to gauge where they were

16   before they came in the hospital and then assess

17   what they need for when they leave.

18        Q.   Okay.  Did you review any documents to

19   prepare for today?

20        A.   Yes.

21        Q.   What did you review?

22        A.   I reviewed my notes.

23        Q.   How many notes did you review?

24        A.   I think it was my initial assessment,

25   then a follow-up note that I wrote.  Then I think

1    the case manager note was also there, in there, who

2    I work with.

3         **Q.   If I gave you the medical record, would**

4    **you be able to identify those notes?**

5         A.   Uh-huh.

6         **Q.   Is that a yes?**

7         A.   Yes.

8         **Q.   Okay.  Let me give you that.**

9              MR. ROZYNSKI:  I'll mark it as an

10   exhibit, Exhibit-1.  This is the medical record for

11   the October 26th, 2017 admission.

12             (Plaintiff's Exhibit 1, Medical

13             Records, were marked for

14             identification.)

15        **Q.   Okay.  What I've marked is --**

16             MR. YOUNG:  Hold on.  I was talking

17   about this exhibit.  I don't have an objection to

18   her talking about pages that she has inputted

19   information on, but I don't think she's qualified

20   to talk to the completeness or the content of the

21   chart.

22             MR. ROZYNSKI:  That's not what this is

23   being introduced for.  I just want to set the

24   foundation.

25             MR. YOUNG:  That is for foundation?

1                    MR. ROZYNSKI:  Of course, yeah.

2                    MR. YOUNG:  Okay.

3                    MR. ROZYNSKI:  I'm not using her to

4      certify these are certified medical records or that

5      she can testify that these are complete or anything

6      of that sort.  I just asked if I gave you the

7      medical records, would you be able to identify your

8      notes.  And she said yes.  So I gave her the

9      medical record.

10                   MR. YOUNG:  Okay.

11          Q.   So here's the medical record.  Do you

12     know where your notes are in that record?

13          A.   Not directly.

14          Q.   All right.  So let's go to page 196.

15     Is that a note by you here?

16          A.   Yes.

17          Q.   Is this the note you were talking

18     about?

19          A.   Yes.

20          Q.   So on 196 it says:  "Refer to social

21     work.  Comments for initial assessment."  It says

22     signed by you.  Is that accurate?

23          A.   Yes.

24          Q.   Okay.  And the comments for initial

25     assessments says SW.  Is that social worker?

1           A.    Yes.

2           Q.    Met with PT.  Is that patient?

3           A.    Yes.

4           Q.    "And wife in room to discuss transition

5    of care needs.  Patient and wife are both deaf, but

6    wife is able to translate."  Was it your

7    understanding you weren't able to communicate with

8    Mr. Tomei directly?

9           A.    Yes, without a translator.

10          Q.    Without his wife or without a

11   translator?

12          A.    Both.  I could have communicated by

13   writing.

14          Q.    But you didn't?

15          A.    But I did not.

16          Q.    Okay.  And you don't know how well Mr.

17   Tomei could write because you never wrote with him?

18          A.    Correct.

19          Q.    Okay.  Did you know if it was

20   appropriate to use a hard of hearing wife as a

21   translator to a patient?

22          A.    I don't know.

23          Q.    Okay.  You said patient -- at the last

24   sentence here it says:  "Patient can not be called

25   as he is deaf.  So needs to be texted."  And it

1    lists a number (865)216-3476 or call (865) 271-9639

2    wife's video phone.  So you believe that Mr. Tomei

3    did not have a phone to call?

4         A.   I was told that that was his phone,

5    216-3476.  And he could text at that phone.

6         Q.   But you weren't aware that he had a

7    phone number that he could be called through the

8    telephone directly?

9         A.   No.

10         Q.   There's some acronyms here says HHC.

11   What's that?

12         A.   Home healthcare.

13         Q.   What's DME?

14         A.   Durable medical equipment.

15         Q.   What's O2?

16         A.   Oxygen.

17         Q.   BIPAP?

18         A.   Bipap and CPAP are breathing devices.

19   So I don't know what their acronyms are for.

20         Q.   Okay.  Where did you get that patient

21   also requires a walker?

22         A.   Probably from the physical therapy.

23         Q.   You didn't get that directly from the

24   patient or the wife?

25         A.   I don't remember.

1     Q.   Okay.  So there's some stuff in here

2   that you could have gotten from other sources other

3   than directly from the wife?

4     A.   Could be, yes.

5     Q.   And you don't know what you got from

6   the wife and what you got from other sources?

7     A.   I don't remember.

8     Q.   Okay.  All right.  Let's go to the next

9   page, 197.  There's progress notes here.  Is this

10  your note?  What's note number one?

11    A.   Yes.

12    Q.   At 10/30/2017 at 12:03 p.m. it says

13  Michaela Whidby, SW.  Is that social worker?

14    A.   Yes.

15    Q.   Informed by CM.  What's CM?

16    A.   Case manager.

17    Q.   That Dr. Pollock will only follow HHC.

18  Do you know what that is?

19    A.   Home healthcare physical therapy.  It's

20  PT.

21    Q.   So you got this from the case manager

22  this information?

23    A.   Yes.

24    Q.   Is any of that information in this note

25  something that you got from the patient or his

1    wife?

2          A.   What do you mean?

3          Q.   Okay.  There's an entry that says:

4    "Social worker informed patient in room by writing

5    on white board that only home healthcare patient

6    physical therapy is set up and he's required to see

7    primary care physician for the other."

8          A.   Okay.

9          Q.   Do you have a specific memory of

10   writing with Mr. Tomei on a white board?

11         A.   Vaguely.

12         Q.   Okay.  What exactly did you write on

13   the white board, if you remember?

14         A.   I don't remember exactly what I wrote

15   on the white board.

16         Q.   And you don't know what he responded

17   with on the white board?

18         A.   No.

19         Q.   Do you know where the white board was

20   located in the room?

21         A.   It would have been on the wall.

22         Q.   So would Mr. Tomei had to get out of

23   his bed to write back with you?

24         A.   Yes.

25         Q.   For him to be able to communicate with

1    you through the white board?

2          A.    Uh-huh.

3          Q.    Is that a yes?

4          A.    Yes.

5          Q.    And do you have a specific recollection

6    of Mr. Tomei getting out of his bed walking to

7    write on the white order?

8          A.    I don't remember him being in the bed.

9    I remember him being in a wheelchair, leaving the

10   room.

11         Q.    Okay.  Was he in the wheelchair writing

12   on the white board?

13         A.    No.

14         Q.    So you don't know how he was -- whether

15   writing on the white board, if at any time?

16         A.    Not on the white board, no.

17         Q.    Okay.  Was Mr. Tomei being discharged

18   against medical advice here?

19         A.    I don't know.

20         Q.    Do you sometimes get involved when

21   patients are being discharged against medical

22   advice?

23         A.    Not usually, unless there's any, like,

24   specific discharge needs that they have.

25         Q.    Were there any other notes that you

 1    reviewed other than these two notes?

 2         A.   No.

 3         Q.   Do you know how to personally set up a

 4    VRI machine?

 5         A.   Like the Stratus?

 6         Q.   Yup.

 7         A.   Yes.

 8         Q.   How do you set it up?

 9         A.   Like how to obtain the translator on

10    there or how?

11         Q.   Actually, set up the system, connect it

12    and get it up and running with the interpreter?

13         A.    It's already connected.  I know how to

14    click on the app and obtain a translator, yes.

15         Q.   Okay.  And if you did that here, that

16    would have been noted in the record?

17         A.   Yes.

18         Q.   Okay.  And if there was a professional

19    in-person translator, you would have noted that in

20    your record?

21         A.   Yes.

22         Q.   Okay.  And there was none of that noted

23    in the record, correct?

24         A.   Correct.

25         Q.    And this is, you said, that you were

```
 1   wheeling him out of the...

 2         A.   I was not wheeling him out.

 3         Q.   You saw him in a wheelchair?

 4         A.   Yes.

 5         Q.   And he was about to leave?

 6         A.   From what I recall, yes.

 7         Q.   And you do not remember seeing a VRI or

 8   in-person interpreter being used?

 9         A.   I don't remember.

10              MR. ROZYNSKI:  Could we mark this as

11   Exhibit 2.  This is the Covenant Health Rights and

12   Responsibilities for Deaf and Hard of Hearing.

13              (Plaintiff's Exhibit 2, Covenant Health

14              Rights and Responsibilities for Deaf

15              and Hard of Hearing, was marked for

16              identification.)

17         Q.   I've marked this as Exhibit 2.  It's an

18   eight-page document, Covenant Health Deaf and Hard

19   of Hearing Rights and Responsibilities.  I'm going

20   to show it to you.  Have you ever seen this before?

21         A.   I'm sure, but I don't remember

22   specifically.

23         Q.   Okay.  When you say I'm sure, what do

24   you mean by that?

25         A.   I would imagine it would have been in
```

1    my training when I started Parkwest.

2        **Q.    But you have no recollection of it?**

3        A.    I mean, I remember reading it when I

4    first was hired or at least reviewing it.

5        **Q.    Have you ever done any communication**

6    **assessment form for a deaf and hard of hearing**

7    **individual?**

8        A.    It's not my role.

9        **Q.    Okay.**

10            MR. YOUNG:  If you're going to ask her

11   questions about the policy, she's needs to be able

12   to sit here and read it.

13            MR. ROZYNSKI:  She's welcome to read

14   it.

15            MR. YOUNG:  Okay.  Take as much time as

16   you need.

17       **Q.    Were you able to review the policy?**

18       A.    Yes.

19       **Q.    Okay.  Let's go to page four.**

20            MR. YOUNG:  May I see this?

21            (Witness Complies.)

22       **Q.    Let's go to page four of the policy.**

23   **Were you familiar or were you aware of the policy**

24   **in letter I in that paragraph of that policy?**

25       A.    I don't remember at the time if I was

1    or not.  I would hope that I was, because I was a

2    new hire and would have reviewed it then.

3         Q.   As you sit here today, did you remember

4    that?

5         A.   As of today, yes.

6         Q.   Prior to reading it or before or after

7    reading it?

8         A.   No, it's familiar now after reading it.

9         Q.   Okay.  So it says:  "Some persons who

10   are deaf or hard of hearing may prefer or request

11   to use a family member or friend as an interpreter

12   or to facilitate communication.  However, family

13   members or friends of the person will not be used

14   unless; A, specifically requested by the individual

15   who is deaf or hard of hearing, the family member

16   or friend agrees to provide the assistance and

17   reliance on the family member or friend is

18   appropriate under the circumstances, see J below;

19   or B, in an emergency situation involving imminent

20   threat to the safety or welfare of the patient or

21   public when no interpreter is available.  The offer

22   of auxiliary aids and services and the response

23   should be documented in the patient's medical

24   records."  You would agree that in your notes there

25   was no indication that Mr. Tomei preferred to use a

1   family member as an interpreter and that a

2   qualified interpreter was offered to him?

3           A.   I did not chart that in my notes,

4   correct.

5           Q.   So if a family member was preferred by

6   Mr. Tomei, would you have noted that in your notes?

7           A.   I don't know if I would have

8   specifically noted that or not.

9           Q.   Were you aware of letter J, that number

10  four, that education related to medication,

11  discharge instructions, et cetera that you should

12  use a qualified interpreter even if the patient

13  prefers a family member?

14              MR. YOUNG:  Hold on for a second.  I

15  want to object.  I think the question misstates

16  what the policy says.

17          Q.   Are you aware --

18              MR. YOUNG:  Can you restate the

19  question, please?

20              MR. ROZYNSKI:  Madam Court Reporter,

21  could you repeat the question.

22              (The Court Reporter reads back the

23  requested text.)

24              MR. YOUNG:  My objection was, I think

25  that misstates what the policy says.

1          MR. ROZYNSKI:  Okay.

2      Q.   So are you aware of that?

3          MR. YOUNG:  You can answer the

4  question, but first review the policy.  And then

5  you can answer his question.

6      A.   I don't know if I was then.

7      Q.   Okay.  Could you go to the last page of

8  this document.  I'll show it to you here.  It's

9  communication assessment tool for deaf or hard of

10  hearing individuals.  Have you ever seen this

11  before?

12      A.   Yes.

13      Q.   Have you ever filled one out?

14      A.   No.

15      Q.   Okay.  When have you seen this?

16      A.   In the policy.

17      Q.   When did you see it in the policy?

18      A.   I don't remember.

19      Q.   Okay.  Is there anything else you

20  remember about your interactions with Mr. Tomei or

21  his wife that you haven't already testified to?

22      A.   Not specifically.

23      Q.   How about generally, other than what

24  you already testified to?

25      A.   No.

1              MR. ROZYNSKI:  Okay.  Thank you for

2    your time.

3              MR. YOUNG:  I have a quick question.

4    EXAMINATION BY MR. YOUNG:

5         Q.   At any point in time during your

6    interactions with Mr. Tomei or Miss Tomei, did they

7    ever request an interpreter?

8         A.   No.

9         Q.   Did they ever request VRI?

10        A.   No.

11        Q.   Did she ever indicate to you in any way

12   that they weren't or let me back up.

13             Miss Tomei ever indicate to you in any

14   way she was not understanding what you were saying?

15        A.   No.

16        Q.   How many -- you've been at Parkwest for

17   two years?

18        A.   Yes.

19        Q.   How many deaf patients have you worked

20   with in two years?

21        A.   This is the only one I recall.

22        Q.   If they had requested an interpreter,

23   what would you have done?

24        A.   I would have probably asked the nurse

25   how they were using interpreters, at least gotten

1    -- either went to the house supervisor, depending

2    if they needed a live interpreter or went and got

3    the Stratus myself.

4           Q.    Have you ever had a problem using the

5    Stratus with other patients?

6           A.    No.

7           Q.    This form that you talked about, this

8    language assessment form, I think that's what it

9    is, communication assessment form.  Is that

10   something that is typically completed before your

11   involvement?

12          A.    Yes.

13          Q.    Does your involvement deal with medical

14   issues involved in the discharge?

15          A.    No.

16          Q.    Your involvement is more setting up

17   home healthcare?

18          A.    Any kind of services for after

19   discharge.

20          Q.    What's your understanding of whose

21   responsibility it is to provide medical advice with

22   regard to discharge?

23          A.    The doctor.

24          Q.    Okay.  Is it your understanding of

25   Covenant's policy that there is a preference for

1    using an interpreter or VRI?

2         A.    There's no preference.

3         Q.    Okay.  We've been talking about this

4    Part J.  As I'm reading Part J it says:

5    "Nonprofessional interpreters (family members or

6    friends) maybe appropriate and request of the hard

7    of hearing patient companion and designated

8    representative, depending on the complexity and

9    nature of the communication.  However, a qualified

10   interpreter may be necessary to insure effective

11   means of communication for patients and companions.

12   The following circumstances may be sufficiently

13   linked to your complex to require an interpreter."

14   Were you -- did you suspect a situation of abuse or

15   neglect?

16        A.    No.

17        Q.    Were you providing a consent for

18   treatment, surgery or procedure?

19        A.    No.

20        Q.    Did you discuss with anyone a diagnosis

21   or specific treatment?

22        A.    No.

23        Q.    Were you given the education related to

24   medication or discharge instructions?

25        A.    Not -- no.

1      Q.   Were you using medical terminology with

2   them?

3      A.   No.

4      Q.   Okay.  When you walked into the room,

5   was another caregiver just leaving?

6      A.   Physical therapist, from what I recall.

7      Q.   And have you observed her communicating

8   with Miss Tomei and Mr. Tomei before you walked in?

9      A.   Yes.

10      Q.   Based on the interaction, did you feel

11   like a method of communication had already been

12   established?

13      A.   Yes.

14      Q.   When you wrote on the white board the

15   information that you wrote down, what were they

16   doing?

17      A.   From what I remember, I do not -- the

18   wife was not in the room, and that he was getting

19   ready to leave.

20      Q.   So did you stop him from leaving to

21   show him that information?

22      A.   From what I remember, yes.

23      Q.   And what did you write down?

24           MR. YOUNG:  What are you showing the

25   witness?

1          MR. ROZYNSKI:  I'm sorry, I'm looking

2    at page 197 of the chart.  And I think we actually

3    used the exhibit up there.

4          A.   I wrote down, I don't remember

5    specifically, that he would only receive home

6    healthcare physical therapy and that not skilled

7    nursing or occupational therapy.  And he would have

8    to follow-up with his doctor if he wanted those

9    services.

10          Q.   Okay.  You can continue to look at the

11    chart.  I've got my own here.

12          A.   Okay.

13          Q.   Looking at page 196 of the chart.  The

14    phone numbers you have there at the bottom, would

15    that have been information that would have been

16    given to you by Miss Tomei?

17          A.   Yes.

18          Q.   The comment that patient lives alone

19    but wife lives close to him.  Is that information

20    you would have gotten from Miss Tomei?

21          A.   Yes.

22          Q.   The Plaintiff's primary care physician,

23    is that information you would have gotten from Miss

24    Tomei?

25          A.   What was that?

1      Q.   Primary care physician is Howard

2   Holmes?

3      A.   Yes, it would have been on his face

4   sheets, I believe.  And I would have just confirmed

5   that with him that that was correctly listed.

6      Q.   Did you observe him communicating

7   independently of you while you were there?

8      A.   Yes.

9      Q.   What types of communication were taking

10  place?

11     A.   Sign language.

12     Q.   Were they texting at all?

13     A.   I don't remember if they were texting

14  back and forth.

15          MR. ROZYNSKI:  Okay.  That's it.  Thank

16  you.

17          (Deposition was concluded at 2:04 p.m.)

18

19

20

21

22

23

24

25

```
 1                C E R T I F I C A T E

 2   STATE OF TENNESSEE

 3   COUNTY OF KNOX

 4          I, Catherine Golembeski, Licensed Court

 5   Reporter and Registered Professional Reporter, do

 6   hereby certify that I reported in machine shorthand

 7   the deposition of MICHAELA WHIDBY, called as a

 8   witness at the instance of the Plaintiff, that the

 9   said witness was duly sworn by me; that the reading

10   and subscribing of the deposition by the witness

11   was waived; that the foregoing pages were

12   transcribed under my personal supervision and

13   constitute a true and accurate record of the

14   deposition of said witness.

15          I further certify that I am not an attorney

16   or counsel of any of the parties, nor an employee

17   or relative of any attorney or counsel connected

18   with the action, nor financially interested in the

19   action.

20                    Cathy J. Golembeski

21                    _____
                      Catherine Golembeski, LCR# 778
22                    Registered Professional Reporter

23

24

25
```

**(**

**(865)** 23:1

**1**

**1** 20:12
**10/30/2017** 24:12
**12:03** 24:12
**17th** 4:5
**196** 21:14,20 37:13
**197** 24:9 37:2
**1:11** 5:2

**2**

**2** 28:11,13,17
**2017** 6:25 7:1,3 8:6
20:11
**2019** 4:5
**216-3476** 23:5
**2300** 4:7
**26th** 20:11
**271-9639** 23:1
**2:04** 38:17

**3**

**37901** 4:8
**37938** 7:25

**8**

**800** 4:6
**865 216-3476** 23:1

**9**

**932** 7:24

**A**

**abuse** 35:14

**access** 10:11,16
**accurate** 21:22
**acronyms** 23:10,
19
**additional** 10:15
**address** 7:22,24
**admission** 20:11
**advice** 26:18,22
34:21
**affirmative** 6:4
**afternoon** 5:8
**agree** 30:24
**agreed** 4:11,20
**agrees** 30:16
**aids** 30:22
**alphabet** 16:11
**amount** 10:7
**Andrew** 5:8
**answers** 13:11
**app** 27:14
**Arnett** 4:6
**arrived** 9:23
**assess** 19:16
**assessment**
18:22,25 19:2,24
21:21 29:6 32:9
34:8,9
**assessments**
21:25
**assistance** 30:16
**August** 8:6
**auxiliary** 30:22
**aware** 23:6 29:23
31:9,17 32:2

**B**

**back** 25:23 31:22
33:12 38:14
**Based** 36:10
**baseline** 19:9

**Baum** 5:10
**bed** 25:23 26:6,8
**began** 5:2
**Bipap** 23:17,18
**bit** 9:1
**board** 25:5,10,13,
15,17,19 26:1,12,
15,16 36:14
**bottom** 37:14
**Bradleyville** 7:25
**break** 7:8
**breathing** 23:18
**Briefly** 9:22
**brought** 5:11

**C**

**call** 13:23 23:1,3
**called** 5:4 14:18
22:24 23:7
**caption** 4:18
**care** 19:13 22:5
25:7 37:22 38:1
**caregiver** 36:5
**case** 20:1 24:16,21
**Catherine** 4:8,12
**Center** 8:2 9:3,18
**certificate** 4:18
**certified** 21:4
**certify** 21:4
**cetera** 31:11
**charge** 9:4 13:21
**chart** 11:23 20:21
31:3 37:2,11,13
**circumstances**
30:18 35:12
**Civil** 4:4
**clear** 6:3 7:15
**click** 27:14
**close** 37:19
**CM** 24:15

**comment** 37:18
**comments** 21:21,
24
**communicate**
11:7 13:5,13 15:12,
13 16:21 22:7 25:25
**communicated**
16:22 22:12
**communicating**
11:25 16:6 17:7
36:7 38:6
**communication**
15:9 29:5 30:12
32:9 34:9 35:9,11
36:11 38:9
**companion** 35:7
**companions**
35:11
**complete** 10:3,7
21:5
**completed** 34:10
**completeness**
20:20
**complex** 35:13
**complexity** 35:8
**Complies** 29:21
**concluded** 38:17
**confirmed** 38:4
**connect** 27:11
**connected** 27:13
**cons** 15:16
**consent** 35:17
**contact** 13:22
**content** 20:20
**continue** 37:10
**correct** 15:6,23
16:18,19 22:18
27:23,24 31:4
**correctly** 38:5
**court** 4:13 5:18 6:4
31:20,22
**Covenant** 28:11,
13,18

**Covenant's** 34:25
**CPAP** 23:18
**crisis** 8:16 14:7,9,
13
**current** 7:21 8:1,7

**D**

**daily** 19:12
**dark** 18:6
**date** 7:1
**Day** 4:5
**deaf** 9:14 13:23,25
14:12 15:9,17,23
16:25 22:5,25
28:12,14,18 29:6
30:10,15 32:9 33:19
**deal** 34:13
**December** 4:5
**decide** 11:20
**degree** 8:23
**depending** 11:10
34:1 35:8
**deposed** 5:6
**deposition** 4:2,11
5:12,13 7:7 38:17
**describe** 9:22
**describing** 6:8
**designated** 35:7
**devices** 23:18
**diagnosis** 35:20
**directly** 13:7 16:22
21:13 22:8 23:8,23
24:3
**discharge** 9:4
11:22 18:14 26:24
31:11 34:14,19,22
35:24
**discharged** 26:17,
21
**discovery** 4:4
**discuss** 22:4 35:20
**dispatch** 13:24

**DME** 23:13

**doctor** 19:14 34:23 37:8

**document** 28:18 32:8

**documented** 30:23

**documents** 19:18

**downfalls** 12:19

**Draper** 4:6

**drive** 7:25 19:13

**duly** 5:5

**Durable** 23:14

**duties** 9:2

**E**

**education** 8:22 31:10 35:23

**effective** 35:10

**eight-page** 28:18

**Eisenberg** 5:9

**emergency** 12:24 30:19

**employee** 9:18

**employer** 7:21 8:1

**English** 10:12,17, 24 12:6

**entry** 25:3

**equipment** 19:14 23:14

**essential** 11:1

**established** 36:12

**estimate** 6:23

**events** 17:17

**exact** 7:1

**EXAMINATION** 5:1,7 33:4

**examined** 5:6

**exhibit** 20:10,12,17 28:11,13,17 37:3

**Exhibit-1** 20:10

**expect** 7:6

**experienced** 11:2

**expressly** 4:19

**F**

**face** 38:3

**facial** 18:7

**facilitate** 30:12

**facilities** 9:6

**familiar** 14:17 16:9 29:23 30:8

**family** 11:12,15,21 12:2,5,14,17,19,23 30:11,12,15,17 31:1,5,13 35:5

**feel** 36:10

**filing** 4:18

**filled** 32:13

**fine** 6:15

**finish** 7:13,17

**firm** 5:9

**follow** 24:17

**follow-up** 19:25 37:8

**form** 4:21 15:8 29:6 34:7,8,9

**formalities** 4:17

**foundation** 20:24, 25

**friend** 30:11,16,17

**friends** 30:13 35:6

**G**

**gauge** 19:15

**gave** 20:3 21:6,8

**Gay** 4:6

**general** 9:2 10:4

**generally** 32:23

**give** 6:3,9 20:8

**Golembeski** 4:8,

12

**Good** 5:8

**graduate** 8:20

**great** 7:19

**ground** 5:17

**grunts** 6:7

**guess** 6:17 13:7

**guessing** 6:18

**H**

**Hagood** 4:6

**hair** 18:6,7

**hands** 16:7

**happened** 6:24,25 7:2,3 17:25

**happy** 6:19

**hard** 16:25 17:1 22:20 28:12,15,18 29:6 30:10,15 32:9 35:6

**hate** 6:5

**head** 6:6,7 13:3

**Health** 28:11,13,18

**healthcare** 23:12 24:19 25:5 34:17 37:6

**hearing** 4:22 16:1, 25 17:1 22:20 28:12,15,19 29:6 30:10,15 32:10 35:7

**Helen** 8:15

**HHC** 23:10 24:17

**highest** 8:21

**hire** 30:2

**hired** 29:4

**Hold** 20:16 31:14

**Holmes** 38:2

**home** 18:15,17 23:12 24:19 25:5 34:17 37:5

**hope** 30:1

**hospital** 14:4,5 19:10,16

**house** 13:22 34:1

**Howard** 38:1

**I**

**identification** 20:14 28:16

**identify** 20:4 21:7

**imagine** 28:25

**imminent** 30:19

**important** 6:2 7:12 13:5

**in-person** 13:17,19 14:3,14 16:16,17 27:19 28:8

**inappropriate** 12:13 15:13

**independent** 19:12

**independently** 38:7

**indication** 30:25

**individual** 29:7 30:14

**individuals** 32:10

**information** 18:18 20:19 24:22,24 36:15,21 37:15,19, 23

**informed** 18:15 24:15 25:4

**initial** 19:24 21:21, 24

**inputted** 20:18

**instance** 5:4

**instructions** 31:11 35:24

**insure** 35:10

**intelligibly** 16:4

**interaction** 17:12 18:12 36:10

**interactions** 17:8 32:20 33:6

**interpreter** 11:11, 12,15,16 12:7,9 13:17,20 14:3,8,15, 21 16:17 27:12 28:8 30:11,21 31:1,2,12 33:7,22 34:2 35:1, 10,13

**interpreters** 12:14, 20 33:25 35:5

**interpretive** 12:10

**introduced** 17:19 20:23

**introducing** 18:19

**involved** 26:20 34:14

**involvement** 34:11,13,16

**involving** 30:19

**issues** 34:14

**J**

**job** 9:2

**K**

**kind** 10:2,3 11:10 14:8 15:2 18:17 19:14 34:18

**knew** 15:22 17:6 18:17

**Knoxville** 4:7 7:25 13:23,25

**L**

**language** 10:11, 16,24 13:6,14 15:18 16:7,10,18 17:3,6 34:8 38:11

**languages** 11:1 14:11 15:2

**Large** 4:10

**law** 5:9

**learn** 10:4,11

**leave** 19:17 28:5 36:19

**leaving** 26:9 36:5, 20

**letter** 29:24 31:9

**level** 8:21

**Licensed** 4:13

**lie** 5:24

**light** 19:14

**linked** 35:13

**lipreading** 15:8,14

**listed** 12:25 38:5

**lists** 23:1

**live** 11:11,15 14:10 19:11 34:2

**lives** 37:18,19

**living** 19:12

**LLP** 4:6

**located** 25:20

**long** 7:7 8:3,17 10:8

**looked** 9:23 18:9

**M**

**machine** 4:12 27:4

**Madam** 31:20

**make** 6:7

**making** 5:19

**male** 18:5

**man** 9:14 15:23

**manager** 20:1 24:16,21

**mark** 20:9 28:10

**marked** 20:13,15 28:15,17

**Masters** 8:23

**materials** 10:21

**matter** 5:10

**Mcnabb** 8:15

**means** 5:23 6:23 12:10,11 35:11

**medical** 8:2 9:3,18

10:5 19:14 20:3,10, 12 21:4,7,9,11 23:14 26:18,21 30:23 34:13,21 36:1

**medication** 31:10 35:24

**member** 12:16 30:11,15,17 31:1,5, 13

**members** 11:16 12:3,6,14,20,24 30:13 35:5

**memory** 6:13,22 9:11 25:9

**Met** 22:2

**method** 36:11

**Michaela** 4:2 5:3 7:24 24:13

**middle** 7:9

**misstates** 31:15, 25

**mobile** 8:16 14:7,9, 13

**months** 10:7

**N**

**nature** 35:9

**needed** 34:2

**neglect** 35:15

**nod** 6:6

**Nonprofessional** 35:5

**Notary** 4:9,14

**note** 19:25 20:1 21:15,17 24:10,24

**noted** 27:16,19,22 31:6,8

**notes** 4:15 19:22, 23 20:4 21:8,12 24:9 26:25 27:1 30:24 31:3,6

**number** 23:1,7 24:10 31:9

**numbers** 37:14

**nurse** 11:9,24 13:21 33:24

**nursing** 9:6 37:7

**O**

**O2** 23:15

**oath** 5:23

**object** 31:15

**objection** 20:17 31:24

**objections** 4:20

**observe** 16:6 17:2 38:6

**observed** 36:7

**obtain** 27:9,14

**obtained** 8:22

**occupational** 37:7

**October** 6:25 7:1,3 20:11

**offer** 30:21

**offered** 31:2

**offices** 4:6

**on-the-job** 10:4

**online** 10:6,18 14:21

**order** 26:7

**orientation** 10:1,8, 10,15

**Oxygen** 23:16

**P**

**p.m.** 5:2 24:12 38:17

**pages** 20:18

**paper** 11:23

**paragraph** 29:24

**Parkwest** 5:11 8:2, 11,14 9:3,18,24 10:5 14:15 29:1 33:16

**Part** 35:4

**patient** 10:23 11:6, 8 12:9 13:8,13 22:2, 5,21,23,24 23:20,24 24:25 25:4,5 30:20 31:12 35:7 37:18

**patient's** 30:23

**patients** 11:14 26:21 33:19 34:5 35:11

**penalties** 5:24

**people** 9:5 10:11, 16 12:1

**perfectly** 6:15

**person** 15:9,17 30:13

**personally** 27:3

**persons** 30:9

**phone** 23:2,3,4,5,7 37:14

**physical** 18:15 23:22 24:19 25:6 36:6 37:6

**physician** 25:7 37:22 38:1

**place** 9:5 38:10

**placement** 9:5

**Plaintiff** 4:3 5:5

**plaintiff's** 20:12 28:13 37:22

**planning** 9:5 11:22 18:14

**Plaza** 4:7

**point** 6:7 33:5

**policies** 10:5

**policy** 29:11,17,22, 23,24 31:16,25 32:4,16,17 34:25

**Pollock** 24:17

**position** 8:7

**potential** 12:19

**prefer** 12:11 30:10

**preference** 11:11 34:25 35:2

**preferred** 30:25 31:5

**prefers** 31:13

**prepare** 19:19

**present** 4:16

**pretty** 18:20

**primarily** 9:5

**primary** 9:7 13:6, 14 19:13 25:7 37:22 38:1

**prior** 8:13,19 9:25 30:6

**problem** 34:4

**procedure** 4:5 35:18

**procedures** 10:5

**proceedings** 5:2

**professional** 4:9, 13 14:3,15 27:18

**programs** 10:6,18

**progress** 24:9

**pros** 15:16

**provide** 30:16 34:21

**providing** 10:11,16 35:17

**PT** 22:2 24:20

**public** 4:9,14 30:21

**purposes** 4:3

**pursuant** 4:4

**Q**

**qualified** 20:19 31:2,12 35:9

**question** 6:19,20 7:10,13,14,16 31:15,19,21 32:4,5 33:3

**questions** 4:21 13:10 19:4,6,7 29:11

**quick** 33:3

**R**

**read** 29:12,13

**reading** 29:3 30:6, 7,8 35:4

**reads** 31:22

**ready** 36:19

**recall** 12:22 16:1, 16 17:10,11,12 18:1,5,8 28:6 33:21 36:6

**receive** 10:15,20 37:5

**received** 9:17

**recollection** 6:23 17:17,22 26:5 29:2

**record** 6:3,10 7:14, 23 20:3,10 21:9,11, 12 27:16,20,23

**records** 20:13 21:4,7 30:24

**Refer** 21:20

**referring** 6:9,11

**regard** 34:22

**Registered** 4:9,13

**rehab** 9:6 18:16

**related** 31:10 35:23

**reliance** 30:17

**remember** 6:14,15, 25 7:2 12:21 13:2 14:16 15:4,5 16:13 17:13 18:7,11,13, 19,20,24 19:3,5 23:25 24:7 25:13,14 26:8,9 28:7,9,21 29:3,25 30:3 32:18, 20 36:17,22 37:4 38:13

**repeat** 31:21

**rephrase** 6:19

**replied** 17:20 18:22

**reporter** 4:9,13,14 5:18 6:5 31:20,22

**represent** 5:10

**representative** 35:8

**request** 4:3 30:10 33:7,9 35:6

**requested** 30:14 31:23 33:22

**require** 35:13

**required** 25:6

**requires** 23:21

**reserved** 4:21

**responded** 25:16

**response** 30:22

**responses** 6:4,9

**Responsibilities** 28:12,14,19

**responsibility** 34:21

**restate** 31:18

**review** 19:18,21,23 29:17 32:4

**reviewed** 19:22 27:1 30:2

**reviewing** 29:4

**Rights** 28:11,14,19

**role** 11:21 29:8

**room** 12:4 17:14 22:4 25:4,20 26:10 36:4,18

**Ross** 8:15

**Rozynski** 5:7,9 20:9,22 21:1,3 28:10 29:13 31:20 32:1 33:1 37:1 38:15

**rules** 4:4 5:17

**running** 27:12

**S**

**safety** 30:20

**school** 8:20 13:23, 25

**Scott** 9:8

**sentence** 22:24

**series** 10:6

**service** 11:13,16

**services** 11:22 12:10,16 30:22 34:18 37:9

**set** 20:23 25:6 27:3, 8,11

**setting** 34:16

**shake** 6:6

**sheets** 38:4

**shorthand** 4:12

**show** 28:20 32:8 36:21

**showing** 36:24

**sign** 15:18 16:7,9, 18 17:3,6 38:11

**signature** 4:17

**signed** 21:22

**sit** 9:11 29:12 30:3

**situation** 30:19 35:14

**situations** 12:24

**skilled** 9:6 37:6

**social** 8:9,10,24 9:2 21:20,25 24:13 25:4

**sort** 21:6

**sources** 24:2,6

**Spanish** 11:3,4,7, 15 12:2 13:4 14:12 15:3,5

**speak** 10:12,17 11:4,14 12:2,6 16:4

**speaking** 15:3

**speaks** 11:7 13:4

**specific** 17:16,22 25:9 26:5,24 35:21

**specifically** 12:21 15:21 18:25 19:5 28:22 30:14 31:8 32:22 37:5

**spoke** 10:24

**start** 8:5

**started** 7:20 8:11 29:1

**state** 4:10 6:10 7:22

**stop** 36:20

**Stratus** 14:18,20, 22,25 16:17 27:5 34:3,5

**Street** 4:7

**stuff** 10:2 24:1

**subject** 5:24

**sufficiently** 35:12

**supervisor** 13:22 34:1

**surgery** 35:18

**suspect** 35:14

**SW** 21:25 24:13

**swear** 4:14

**sworn** 5:5,22

**system** 27:11

**T**

**taking** 5:18 38:9

**talk** 9:16 20:20

**talked** 34:7

**talking** 7:15 20:16, 18 21:17 35:3

**taught** 16:11

**telephone** 23:8

**telling** 18:21

**Tennessee** 4:4,7, 8,10 7:25

**terminology** 36:1

**test** 6:14

**testified** 16:15 32:21,24

**testify** 21:5

**text** 23:5 31:23

**texted** 22:25

**texting** 38:12,13

**therapist** 18:16 36:6

**therapy** 23:22 24:19 25:6 37:6,7

**thing** 17:12

**things** 6:4,5,7 19:12

**threat** 30:20

**time** 5:16 7:8 26:15 29:15,25 33:2,5

**timeline** 17:17

**times** 15:1

**today** 9:12 19:19 30:3,5

**told** 23:4

**Tomei** 5:10 9:8,14 15:22 16:21 17:3,5, 9 18:2,8 22:8,17 23:2 25:10,22 26:6, 17 30:25 31:6 32:20 33:6,13 36:8 37:16, 20,24

**tool** 32:9

**top** 13:2

**touching** 4:17

**trained** 12:13,19 13:12 15:7,19

**training** 9:17,23,25 10:1,4,16,21 12:12, 23,25 15:11 29:1

**transcribe** 4:15

**transcript** 5:19

**transition** 22:4

**translate** 22:6

**translator** 22:9,11, 21 27:9,14,19

**transmission** 4:18

**treatment** 35:18,21

**truth** 5:22

**types** 38:9

**typewriting** 4:16

**typically** 12:13 34:10

## U

**uh-huh** 6:1,6 9:19
11:17 20:5 26:2

**um-hum** 6:6

**understand** 7:4
16:24

**understanding**
22:7 33:14 34:20,24

**unit** 8:16

**unreliable** 15:8

**UT** 8:20

**utilized** 14:2,6

## V

**vaguely** 18:3,20
25:11

**verbal** 6:9

**video** 11:12,16
14:10,21 23:2

**voice** 16:1

**VRI** 27:4 28:7 33:9
35:1

## W

**wait** 7:13

**waived** 4:19

**walk** 17:14

**walked** 36:4,8

**walker** 23:21

**walking** 26:6

**wall** 25:21

**wanted** 18:17 37:8

**weeks** 10:9

**welfare** 30:20

**wheelchair** 26:9,
11 28:3

**wheeling** 28:1,2

**Whidby** 4:2 5:3
7:24 24:13

**white** 18:5 25:5,10,
13,15,17,19 26:1,7,
12,15,16 36:14

**wife** 16:23,24 18:20
22:4,5,6,10,20
23:24 24:3,6 25:1
32:21 36:18 37:19

**wife's** 23:2

**willfully** 5:24

**witnesses** 6:5

**work** 8:13,19,24
20:2 21:21

**worked** 8:3,15
33:19

**worker** 8:9,10 9:2
21:25 24:13 25:4

**working** 8:11

**workload** 9:7

**write** 22:17 25:12,
23 26:7 36:23

**writing** 15:17 22:13
25:4,10 26:11,15

**wrote** 19:25 22:17
25:14 36:14,15 37:4

## Y

**year-and-a-half**
8:18

**yearly** 10:22

**years** 8:4 33:17,20

**YOUNG** 20:16,25
21:2,10 29:10,15,20
31:14,18,24 32:3
33:3,4 36:24

**Yup** 27:6