UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| SCOTT ALLEN TOMEI, | ) |
| | ) |
| Plaintiff, | ) 3:19-CV-00041-DCLC-JEM |
| | ) |
| vs. | ) |
| | ) |
| PARKWEST MEDICAL CENTER and | ) |
| COVENANT HEALTH, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. 30]. Plaintiff responded in opposition [Doc. 35] and Defendants replied [Doc. 36]. The motion is now ripe for resolution. For the reasons that follow, Defendants' Motion for Summary Judgment [Doc. 30] is **GRANTED IN PART AND DENIED IN PART**.

**I.     BACKGROUND**

Plaintiff, Scott Allen Tomei, is a deaf individual who communicates primarily through American Sign Language ("ASL") [Doc. 35-14, ¶ 2]. In October 2017, Plaintiff sought medical treatment at Parkwest Medical Center ("Parkwest") in Knoxville, Tennessee after he fell and injured his right leg and foot at his home [*Id*. at ¶¶ 3–4].[1]  Plaintiff was initially treated and sent home on October 24, 2017, but he went to the emergency room at a different hospital two days later. That hospital transferred Plaintiff back to Parkwest on October 26, 2017, where he underwent surgery to remove blood clots in his leg and remained hospitalized until October 30,

---

[1]  Defendants Covenant Health and Parkwest are both Tennessee nonprofit public benefit corporations [Doc. 30-1, ¶¶ 3–4]. Parkwest is one of Covenant Health's many subsidiaries—Covenant Health has been the sole member of Parkwest since September of 1996 [*Id*. at ¶ 6].

1

2017 [Doc. 31, pg. 1]. Two days after his discharge from Parkwest, Plaintiff's leg and foot were not improving, so he went to his primary physician who referred him to the University of Tennessee Medical Center ("UTMC"). At UTMC, Plaintiff underwent another surgery to remove blood clots from his leg. However, the doctors at UTMC ultimately had to amputate 30 percent of Plaintiff's right leg.

While hospitalized at Parkwest, Plaintiff informed the staff that he was deaf and requested both Video Remote Interpreting ("VRI")[2] and in-person ASL interpreting services [Doc. 36, pg. 6, ¶ 2].[3] Parkwest staff never provided an in-person ASL interpreter [*Id*. at pg. 7, ¶ 6]. Rather, they used written communication, a VRI device, and Plaintiff's daughter, mother, and ex-wife as interpreters. Plaintiff contends that these methods of communication were not effective.

Plaintiff's ex-wife can speak some English, but she is also deaf and can only understand approximately 55 percent of speech [Doc. 30-6, pg. 3; Doc. 30-8, pg. 2; Doc. 35-14, ¶ 11]. Neither Plaintiff's daughter nor his mother is hearing impaired, but they are not professional interpreters. Plaintiff's daughter learned ASL from being around her parents and people in the deaf community [Doc. 30-5, pg. 5; Doc. 30-7, pg. 2] and Plaintiff's mother merely "home signs" with Plaintiff [Doc. 35-14, ¶ 10]. Plaintiff's ex-wife testified that her daughter does not know how to listen and interpret at the same time—she hears what is being said, tries to remember what was said, and attempts to provide the interpretation [Doc. 35-7, pg. 43].

---

[2] VRI is "an interpreting service that uses video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images[.]" 28 C.F.R. § 36.104.

[3] Plaintiff completed a "Communication Assessment and Right to Interpreter for Hearing Impaired Form" [Doc. 35-3], indicating his preference for a qualified interpreter using either a video remote interpreting service or an on-site qualified interpreter. Sharon Monday, Parkwest's Manager of Regulatory Compliance, testified that, in addition to the form, patients may inform staff of their preference of communication.

2

As for the VRI device, Plaintiff and his family members assert that it never functioned properly [Doc. 36, pg. 7, ¶ 7]. Plaintiff contends that the VRI kept freezing and he repeatedly tried to tell staff that he needed an in-person interpreter because the VRI was not working [Doc. 35-4, pgs. 107, 110–11, 115–16]. Plaintiff's daughter also testified that she never witnessed a successful interaction using the VRI device [Doc. 35-5, pg. 19]. She testified that it kept freezing and that the interpreter on the other end also expressed she was having trouble seeing Plaintiff for the same reasons [*Id.*]. Plaintiff's ex-wife described the VRI device as an "epic fail" because it froze, they would hang up, call again, and it would freeze again mid-sign and they could not understand anything [Doc. 35-7, pg. 41]. Plaintiff's daughter and ex-wife also testified that they repeatedly asked for an in-person interpreter because the VRI device was not functioning properly [Doc. 35-5, pgs. 15, 18–19; Doc. 35-7, pgs. 26, 40].[4]

Plaintiff testified that he had no idea what was going on without an interpreter [Doc. 35-4, pg. 79]. He stated that he did not know or understand the diagnosis of his leg after his initial visit on October 24, 2017, that he did not understand what most of the documents he signed meant, and that the "nurses and doctors [were] talking all the time" but he was "completely lost because [he] couldn't hear" [*Id.* at pgs. 79, 85, 88, 109]. Plaintiff's daughter testified that Plaintiff could not communicate how he was feeling or what he was going through and, when he was discharged, he was trying to tell the nurse that his leg still hurt, but the nurse thought he was saying that he wanted to go home [Doc. 35-5, pgs. 22–23].

---

[4] Defendants assert that the hospital staff believed the VRI functioned properly [Doc. 35-14, ¶ 7] and various staff testified that they never experienced issues with the VRI equipment [Doc. 30-2, pg. 2; Doc. 30-3, pg. 2; Doc. 30-4, pg. 11]. However, for purposes of summary judgment, the Court must view the facts in the light most favorable to Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Based on the foregoing, Plaintiff initiated this action against Defendants, alleging that they discriminated against him on the basis of his disability, in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a) [Doc. 1]. Plaintiff seeks declaratory, injunctive, and monetary relief [*Id*.]. Before the Court is Defendants' Motion for Summary Judgment [Doc. 30] in which they argue that Plaintiff is not entitled to any of the relief sought in his Complaint.

## II. LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "come forward with significant probative evidence showing that a genuine issue exists for trial." *McKinley v. Bowlen*, 8 F. App'x 488, 491 (6th Cir. 2001). "The nonmoving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmoving party based on the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).

4

### III. ANALYSIS

Defendants seek summary judgment on Plaintiff's sole claim—discrimination on the basis of disability in violation of Section 1557 of the ACA. To properly address Defendants' arguments, an understanding of the ACA's relationship to other civil rights statutes is necessary. Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, and disability in certain federally funded health programs and activities. 42 U.S.C. § 18116(a). The statute does so by incorporating the discrimination prohibitions from four existing civil rights statutes.[5] In other words, "the statute picks up the type of discrimination—the standard for determining discrimination—prohibited under each of the four incorporated statutes." *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 238 (6th Cir. 2019).

The ACA's prohibition against disability discrimination flows from its reference to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Thus, the standard for determining discrimination under Section 504 applies to claims of disability discrimination under Section 1557 of the ACA. *Id*. The statute further requires courts to "apply the enforcement mechanisms of the Rehabilitation Act to ACA claims." *Tomei v. Parkwest Med. Ctr.*, 24 F.4th 508, 514 (6th Cir. 2022). As a result, individuals alleging disability discrimination under Section 1557 of the ACA "may seek injunctive relief, damages, etc." to the extent such enforcement mechanisms are available under the Rehabilitation Act. *Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 66 n.4 (2d Cir. 2021).

---

[5] Section 1557 provides: "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]" 42 U.S.C. § 18116(a).

In support of their Motion for Summary Judgment, Defendants contend: (1) Plaintiff lacks standing for injunctive relief; (2) Plaintiff cannot recover compensatory damages because he has failed to show that any purported discrimination by Defendants was intentional; and (3) Plaintiff cannot establish liability against Covenant Health for the alleged actions or omissions of Parkwest [Doc. 30].[6] The Court will examine each of Defendants' arguments in turn.

### A. Standing for Injunctive Relief

Standing is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To attain Article III standing, a plaintiff must demonstrate three elements: (1) an "injury in fact"; (2) causation; and (3) redressability. *Id*. at 560–61. When, as here, a plaintiff seeks prospective injunctive relief, "[t]he injury inquiry is…twofold…as it requires plaintiff to show both 'past injury and a real and immediate threat of future injury.'" *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019) (quoting *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013)).

Defendants argue, inter alia, that Plaintiff's own deposition testimony negates the existence of a real and immediate threat of future injury and, thus, Plaintiff lacks standing to pursue injunctive relief [Doc. 31, pg. 12]. Plaintiff testified in his deposition as follows:

> Q. […] Have you been back to Parkwest since your leg was amputated?
> A. No.
> Q. Do you have any plans to go back to Parkwest?
> A. No.
> Q. Do you prefer other hospitals?
> A. Yes.
> Q. Do you prefer UT Medical Center to Parkwest?
> A. Yes.

---

[6] Defendants also argue, referencing their previously filed Motion to Dismiss [Doc. 29], that Plaintiff cannot succeed in his prayer for declaratory and injunctive relief because his claims are time-barred [Doc. 31, pgs. 7, 21]. Defendants' arguments based on the statute of limitations are foreclosed by this Court's denial of the Motion to Dismiss [Doc. 41] and the Sixth Circuit's opinion affirming that denial, *Tomei*, 24 F.4th at 510.

> Q. If you had a need for a large hospital, you would go to UT Medical Center?
> A. Correct.

[Doc. 35-4, pgs. 152–53]. Defendants contend Plaintiff's concessions that he has no plans to go back to Parkwest and that he would rather go to UTMC clearly negate any purported threat of future injury [Doc. 31, pg. 12]. Defendants further assert that Plaintiff's own actions support his deposition testimony. That is, he has not been to Parkwest since 2017 [*Id*. at pg. 13].

Plaintiff argues he has established a threat of future injury because he demonstrated he has an intent to return to Parkwest or, alternatively, because he has been deterred from doing so due to the lack of effective communication and discrimination against him [Doc. 35, pg. 13]. Plaintiff relies on the standard articulated in *Gaylor v. Hamilton Crossing CMBS*, in which the Sixth Circuit held that a plaintiff seeking injunctive relief pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq*. ("ADA"), could demonstrate a threat of future injury by showing "(1) a plausible intent to return to the noncompliant accommodation or (2) that he would return, but is deterred from visiting the noncompliant accommodation because of the alleged accessibility barriers." 582 F. App'x 576, 580 (6th Cir. 2014). However, this standard is not appropriately applied to Plaintiff's ACA claim.

The Sixth Circuit has only employed the *Gaylor* standard in the context of Title III public accommodation claims for alleged violations involving architectural barriers or structural deficiencies, not discriminatory conduct in the delivery of services. *See Gaylor*, 582 F. App'x at 578; *Mosley*, 942 F.3d at 755. In cases such as those with physically present barriers, it logically follows that if a plaintiff can show that he will return to the location, he will encounter the barriers. In contrast, Plaintiff's Section 1557 claim involves purported discriminatory *conduct*, which is not as "concrete" as tangible and existing architectural barriers. For example, even if Plaintiff established an intent to return to Parkwest or that he would return but he is deterred from doing so

7

due to prior discrimination, this standard does not take into account that he would still be required to demonstrate a "real and immediate" threat that Parkwest would discriminate against him again by failing to provide interpretive services. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). It is this deficiency that leads the Court to conclude that the *Gaylor* standard is inapplicable here.

Assuming, arguendo, that the *Gaylor* standard applies, the only evidence Plaintiff offers in support of his assertion that he has an intent to return to Parkwest or that Parkwest's noncompliance with the ACA has deterred him from doing so is an allegation in his Complaint that he still wishes to access Defendants' facilities but is prevented from doing so by Defendants' discrimination against him on the basis of his disability, and statements in his affidavit, which he provided in response to Defendants' Motion for Summary Judgment.

It is well-established that a party may not rely on mere allegations in the pleadings in response to a motion for summary judgment. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Therefore, Plaintiff may not rely on the allegation contained in his Complaint. Plaintiff's affidavit is also insufficient. Plaintiff testified in his deposition that he has no plans to go back to Parkwest [Doc. 35-4, pgs. 152–53] but he averred in his affidavit that he has a "definite plan to return to Parkwest in the future" [Doc. 35-2, ¶ 9]. Furthermore, Plaintiff testified that if he had a need for a large hospital in the future, he would go to UTMC [Doc. 35-4, pg. 153], but he later stated in his affidavit that if he had a need for a large hospital in the future, he would "like to visit Parkwest if it provides effective communication according to the law and if it does not discriminate against me." [Doc. 35-2, ¶ 13]. "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechele v. Cedar Point, Inc.*,

8

747 F.2d 209, 215 (6th Cir.1984)). Plaintiff has not provided any "persuasive justification for the contradiction." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).

For these reasons, Plaintiff has failed to produce sufficient evidence showing that he is likely to return to Parkwest in the future or, if he does, that he will suffer discrimination on the basis of his disability. *See O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief…if unaccompanied by any continuing, present adverse effects."). Therefore, Plaintiff has failed to demonstrate the requisite real and immediate threat of future injury and Defendants' motion is **GRANTED** as to Plaintiffs' prayer for injunctive relief.

### B. Intentional Discrimination

Under the Rehabilitation Act and, by extension, Section 1557 of the ACA, compensatory damages for disability discrimination are only recoverable upon a showing that the discrimination was intentional. *Hill v. Bradley Cty. Bd. of Educ.*, 295 F. App'x 740, 742 (6th Cir. 2008). Intent to discriminate is established by showing that the defendant acted with deliberate indifference. *R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cty.*, Ky., 637 F. App'x 922, 925 (6th Cir. 2016) (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." *Duvall*, 260 F.3d at 1139 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1988)).

Relevant to the instant matter, "[a] hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference." *Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 604 (11th Cir. 2015). Rather, Plaintiff must show that Defendants "knew there was a substantial likelihood that they would be unable to communicate effectively with him

9

absent an interpreter but still made a 'deliberate choice' not to provide one." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014). "When the plaintiff has alerted the public entity to his need for accommodation…the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Duvall*, 260 F.3d at 1139.

Defendants argue that Parkwest could not have had knowledge of a substantial likelihood of ineffective communication, because the staff effectively communicated with Plaintiff through the use of the VRI device, written communication, and his family members [Doc. 31, pgs. 19–20]. Defendants further contend that even if Parkwest staff did have knowledge of communication issues, Plaintiff still cannot show that they made a deliberate choice to refuse interpretive services [*Id.* at pg. 20]. However, Defendants' position is genuinely disputed by the record.

Viewing the facts in the light most favorable to Plaintiff, the record indicates that Parkwest staff had notice of a substantial likelihood that they would be unable to communicate effectively with Plaintiff. It is undisputed that Plaintiff made his need for ASL interpretive services known, both by filling out the Communication Assessment and Right to Interpreter for Hearing Impaired Form and by repeatedly indicating his preference for an in-person interpreter. *See* 28 C.F.R. § 35.160(b)(2) (the regulations in effect at the time of Plaintiff's hospitalization required Parkwest to give "primary consideration" to the kind of aid requested by a person with a communication disability in determining what types of auxiliary aids and services are necessary.); *See also Vega-Ruiz*, 992 F.3d at 64–65.

Despite Plaintiff's requests for a qualified in-person interpreter, Parkwest staff decided to rely, in part, on the VRI device, which allegedly froze and never provided a successful interaction between the interpreter and Plaintiff. *See* 28 C.F.R. § 35.160(d) ("A public entity that chooses to

10

provide qualified interpreters via VRI services shall ensure that it provides…[r]eal-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication[.]"). When not using the VRI device, Parkwest staff again chose not to provide Plaintiff with a qualified interpreter and instead relied on Plaintiff's family members, despite the fact that Plaintiff's ex-wife is also deaf and neither Plaintiff's daughter nor his mother is a qualified interpreter. *See* 28 C.F.R. § 35.160(c)(2) ("A public entity shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication except…[i]n an emergency …where there is no interpreter available; or [w]here the individual…specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and *reliance on that adult for such assistance is appropriate under the circumstances*.) (emphasis added).

Based on the foregoing, the Court finds that Plaintiff has produced sufficient evidence to create a genuine dispute of fact as to whether Defendants acted with deliberate indifference—that is, whether they knew there was a substantial likelihood that they would be unable to communicate effectively with him but still made a deliberate choice not to provide effective communication. *See Duvall*, 260 F.3d at 1140 (finding a jury issue of deliberate indifference because, among other things, a public entity was on notice that a particular accommodation was "inadequate" but the entity persisted in relying on the accommodation); *see also Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 351 (11th Cir. 2012) ("[A hospital official's] apparent knowledge that [a patient] required an additional interpretive aid to effectively communicate with him and his deliberate refusal to provide that aid satisfies the deliberate indifference standard."). Accordingly, Defendants' motion as it relates to Plaintiff's prayer for compensatory damages is **DENIED**.

### C. Covenant Health's Liability

Defendants argue that Covenant Health is entitled to summary judgment because (1) no medical personnel who provided Plaintiff's treatment or care at Parkwest were employees or agents of Covenant Health and (2) Plaintiff cannot prove that Covenant Health is the owner or operator of Parkwest [Doc. 31, pgs. 22–24].[7] In response, Plaintiff argues that there are sufficient facts in the record to raise a triable issue as to whether Covenant Health maintains sufficient control over Parkwest's implementation of accommodations for deaf and hard of hearing individuals [Doc. 35, pgs. 26–27].

Parkwest is a nonprofit corporation and a wholly owned subsidiary of Covenant Health [Doc. 30-1, ¶ 3]. Covenant Health may not be held liable for the acts of Parkwest solely by reason of its status as Parkwest's parent corporation. *See* Tenn. Code Ann. § 48-56-203. However, Covenant Health may be directly liable as "an entity operating or administering a [health] program or activity" under Section 1557 of the ACA. 45 C.F.R. § 92.102(a). The question of liability necessarily turns on the amount of control Covenant Health had over Parkwest and the accommodations provided to Plaintiff at Parkwest. *See Allen v. Pac. Bell*, 212 F. Supp. 2d 1180, 1200 (C.D. Cal. 2002), *aff'd in part*, 348 F.3d 1113 (9th Cir. 2003) (holding that a parent corporation is not liable for disability discrimination law for the acts of a subsidiary where it exercised "no more control ... than that typically exercised by the parent corporation in a parent/subsidiary corporate relationship"); *see also Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d

---

[7] Defendants also cite Tenn. Code Ann. § 48-56-205 as support for their position that Plaintiff may only bring a lawsuit against Covenant Health as a member of Parkwest if an execution on a final judgment against Parkwest has been returned unsatisfied or if a proceeding against Parkwest would be useless [Doc. 31, pg. 23]. As Plaintiff points out, this statute applies to "creditors" of a nonprofit corporation and Defendants offer no case law to support that it applies to civil liability for a claim under federal law for disability discrimination.

12

824, 842 (11th Cir. 2017) (declining to dismiss parent organization of medical facilities from ADA and Rehabilitation Act action because the parent organization "owns and operates the hospitals at which Plaintiffs presented, it houses the network to which the VRI machines are connected, and applies its various policies and procedures to" the hospitals).

Covenant Health created and provided a Deaf and Hard of Hearing Rights and Responsibility Policy for each of its subsidiary hospitals, including Parkwest, and mandated the facilities' compliance with the policy [Doc. 35-12]. The policy also lists the interpreting agencies the facilities must contact for an interpreter and designates Stratus as the video interpreting service provider to be used [*Id*. at pgs. 3–4]. Additionally, Covenant Health, rather than Parkwest, contracted with Stratus for video interpreting services at each of its subsidiary facilities [Doc. 35-13]. Finally, Covenant Health provides Parkwest's "internal intranet," which Plaintiff suggests gives rise that Covenant Health not only owns Parkwest but potentially "houses the network to which the VRI machines are connected." [Doc. 35, pg. 27] (quoting *Silva*, 856 F.3d at 842). Covenant Health exercises more control over Parkwest and its policies relating to accommodations "than that typically exercised…in a parent/subsidiary corporate relationship." *Allen*, 212 F. Supp. 2d at 1200. Based on the foregoing, Plaintiff has presented sufficient evidence to create a genuine issue of fact as to Covenant Health's liability. Thus, Defendants' motion as it relates to the dismissal of Covenant Health is **DENIED**.

IV.    **CONCLUSION**

Accordingly, for the reasons stated herein, Defendants' Motion for Summary Judgment [Doc. 30] is **GRANTED IN PART AND DENIED IN PART**.

SO ORDERED:

s/ Clifton L. Corker<br>
United States District Judge
